MILLS MANUFACTURING
CORPORATION

v.

The UNITED STATES.

Nos. 607–71, 655–71 and 697–71.

United States Court of Claims.

Feb. 22, 1978.

As Amended Feb. 23, 1978.

Walter A. I. Wilson, Washington, D. C., for plaintiff; John T. Koehler, Washington, D. C., atty. of record; Hudson, Creyke, Koehler & Tacke, Washington, D. C., of counsel.

C. Max Vassanelli, Washington, D. C., with whom was Asst. Atty. Gen., Barbara Allen Babcock, Washington, D. C., for defendant; Gerald D. Freed, Washington, D. C., of counsel.

Before DURFEE, Senior Judge,* DAVIS and KASHIWA, Judges.

* Senior Judge Durfee heard the argument but died before the preparation and adoption of this opinion.

## OPINION

DAVIS, Judge.

These renegotiation cases, in which plaintiff's profits for its fiscal years 1967, 1968 and 1969, are at issue, come before the court on defendant's exceptions to findings of fact and recommended decision by Trial Judge Harkins. The Renegotiation Board determined that plaintiff had realized excessive profits in the amount of $500,000 for its fiscal year 1967, $550,000 for 1968, and $150,000 for 1969. Plaintiff petitioned the United States Tax Court for a redetermination of the board's orders for 1967 and 1968, on May 16, 1969 and August 24, 1970, respectively. Pursuant to the extension of the Renegotiation Act of 1951, Pub.L. No. 92–41, § 3, 85 Stat. 97 (1971), these cases were transferred to the Court of Claims on July 29, 1971 for 1968, and August 2, 1971, for 1967. Plaintiff petitioned the Court of Claims for a *de novo* redetermination of the board's order for 1969 on August 25, 1971. 50 U.S.C. App. § 1218 (1970), (Supp. V 1975). On March 29, 1974, the cases were consolidated. Contrary to the board, the trial judge concluded that the Government had not met its burden of proof and that consequently Mills deserved a clearance for each of the years under review. We cannot completely agree and find that Mills earned excessive profits in the amount of $425,000 for 1967, and $350,000 for 1968. For 1969, however, we affirm the clearance given by the Trial Division.[1]

### I.

Since the Korean War, Mills Manufacturing Corp., has been engaged exclusively in the manufacture of various types of military parachutes for the United States and has enjoyed a good reputation both as one of the most efficient parachute manufacturers in the field and as a supplier of high quality products. Mills has manufactured

1. The necessary findings of fact are contained in this opinion.

four types of parachutes: flare, personnel, cargo and deceleration. Flare parachutes, used in connection with the aerial delivery of various types of illuminating flares, are the least complex to manufacture, requiring smaller manufacturing space and less labor. They are manufactured on a production line basis and involve a cutting, stitching and threading operation most comparable to textile fabrication. Manufacture of personnel, cargo, and deceleration parachutes involve more complex techniques, procedures and skills which are considerably more difficult than those customarily found in commercial textile fabrication. Mills made four models of personnel parachutes, each model manufactured to precise specifications that controlled weight, construction, and strength of canopy fabrics and suspension lines, as well as the size, type and number of stitches, seams and hems. The cargo parachute was even more complex, constituting Mills' most time-demanding production item. The deceleration parachute made by Mills was a complex item functioning as an ancillary braking mechanism for the F–100 series of fighter aircraft. Operational requirements demanded a small diameter canopy that combined light weight with the ability to sustain payloads ranging up to 48,400 pounds.

All of plaintiff's contracts for the production of these items were obtained as a result of competitive bidding on advertised procurements and were on a firm, fixed price basis. The company was also responsible for all costs of manufacture, receiving no loans, advance payments, or government furnished materials from defendant. Plaintiff was however, eligible for both small business and labor surplus "set-aside" awards through which it would be allowed to accept a portion of a procurement order (up to 50%) at the lowest bid price, even though plaintiff had originally submitted a higher bid. Approximately one third of Mills' total review period sales resulted from acceptance of set-aside portions.

The 1967–69 review years were a period of change in the military parachute market in general, as well as in Mills' own activity. The total value of defense procurements of military parachutes more than doubled from the $27.8 million in 1965 to the $62.6 million in 1967. The number of contracts awarded by the Department of Defense rose from 290 in 1965 to a high of 456 in 1968, while the number of contractors filling those orders rose from 57 in 1965 to a high of 88 in 1967. Nevertheless, there was a tendency towards price stability or price decline in government purchases of parachutes during that time (while the industry's profitability, on a return-on-sales basis, more than doubled its 1965 level). Changes occurring to Mills' business during this period can be summarized in tabular form as follows:

| Year | Sales (000) | Equity (000) | Profit (000) | Return on sales | | Return on equity | | Renegotiation Board action |
|------|-------------|--------------|--------------|-----------------|------|------------------|------|---------------------------|
| 1962 | 2,773 | 613 | 60 | 2.17 | | 9.81 | | clearance |
| 1963 | 5,005 | 642 | 246 | 4.92 | | 38.37 | | clearance |
| 1964 | 6,482 | 747 | 582 | 8.98 | | 78.00 | | clearance |
| 1965 | 6,588 | 1,000 | 465 | 7.06 | | 46.49 | | clearance |
| 1966 | 8,562 | 1,214 | 824 | 9.62 | | 67.84 | | clearance |
| 1967 * | 13,376 | 1,563 | 1,827 | 13.7 | 10.4 ** | 116.9 | 84.9 ** | 500,000 |
| 1968 * | 10,256 | 2,014 | 1,466 | 14.3 | 9.5 ** | 72.8 | 45.5 ** | 550,000 |
| 1969 * | 11,346 | 2,539 | 1,252 | 10.5 | 9.7 ** | 49.3 | 43.4 ** | 150,000 |

\* Years under review
\*\* Ratio after Renegotiation Board determinations of excessive profit.

Profits, sales, equity and their ratios made increases in this three year period. Mills also increased the number of its employees; shifted the mix of parachutes it made—increasing flare parachute production, decreasing personnel parachute production, and decreasing, then increasing, its production of cargo parachutes; and increased the proportion of its contracts performed as subcontracts.

We must determine, of course, whether these changes, occurring during the period of peak, Vietnam wartime procurement, are indicative of the recovery by Mills of excessive profits which the Government is entitled to recover.

## II.

The parties have spent a great deal of time briefing and arguing the role of competition and market analysis in renegotiation. The difficulty does not lie in recognition that contracts awarded in a truly competitive market produce reasonable profits. The ultimate purpose of renegotiation is to approximate that competitive norm, and the statutory factors and regulations attempt to insure that the proper considerations are taken into account in attempting to fill in the gaps wartime procurement may make in the competitive process. *Major Coat Co. v. United States*, 543 F.2d 97, 110, 211 Ct.Cl. 1, 23 (1976); *Mason & Hanger-Silas Mason Co. v. United States*, 518 F.2d 1341, 1346–48, 207 Ct.Cl. 106, 115–17 (1975). The difference between the parties lies in deciding how the presence of a competitive market is to be determined and who has the burden of such proof. Mills' argument is essentially one based upon its burden of proof in renegotiation. *Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 198 Ct.Cl. 312 (1972). Relying upon its evidence of the number of contractors in the parachute market and the number of contractors actually bidding against plaintiff during the review years, plaintiff asserts that it has met its burden of going forward as to the existence of competition in the parachute market, and that a presumption is thus raised that its profits were reasonable.[2] The Government's failure to present evidence to overcome this prima facie case for competition is said to mandate a clearance for the review years. The Government contends that the trial judge has adopted this position and that the necessary result is that contractors will find

this such an easy prima facie path that the Government will have to prove an antitrust case on market dislocations before excessive profits can be found. Such a burden, it is alleged, will result in an exemption under the Renegotiation Act, 50 U.S.C. App. §§ 1211–1224 (1970 & Supp. V 1975), for competitively bid, fixed price contracts.

 Although we do not think that the trial judge created a de facto exemption for competitively bid fixed price contracts, we do disagree with giving it as much importance as he does in the renegotiation process. When the analysis over-stresses the presumed competitiveness of the particular market, the result is a by-passing of the required analysis under the statutory factors. 50 U.S.C. App. § 1213(e) (1970). As noted above, the ultimate objective of renegotiation is to approximate a competitive norm. *Major Coat*, 543 F.2d at 110, 211 Ct.Cl. at 22–23. If it is established or "presumed" in advance that full competition exists in a particular market, consideration of the firm's efficiency, risk, and other statutorily mandated factors would necessarily be much lessened. Use of such a single formula would thus be contrary to the flexibility of approach that has formed the very purpose of the statutory system, *Mason & Hanger*, 518 F.2d at 1346, 207 Ct.Cl. at 117; *A. C. Ball Co. v. United States*, 531 F.2d 993, 1015–16, 209 Ct.Cl. 223, 263 (1976). Furthermore, over-emphasis on the presence or absence of competition puts too great a strain upon the allocation of burden of proof in renegotiation cases. Those burdens were established with specific reference to the statutory factors, *Lykes Bros.*, 459 F.2d at 1401, 198 Ct.Cl. at 326, 327, and to the existence and amount of excessive profits. There is no presumption that a particular form of contractual system, in and of itself, shows the absence of excessive profits. There must always be some further particularized inquiry. In *Major Coat*, for example, the court found in the dislocations caused by the buildup of wartime pro-

2. Mills does not, however, rely exclusively on this argument. Elsewhere it argues that its entitlement to favorable consideration under several statutory factors warrants its clearance for the years under review.

duction and the use of rated orders, evidencing pressure on productive capacity, an absence of competition sufficient to permit renegotiation and to preclude comparison with other manufacturers of the same product. Determinative for these two purposes was the existence of the potential for excessive profits, 543 F.2d at 112, 211 Ct.Cl. at 27, the problem was not analyzed simply in accordance with the *Lykes* burdens. Again, in *A. C. Ball,* 531 F.2d at 1015, 209 Ct.Cl. at 261, 262, the contractor worked under firm fixed price contracts awarded on the basis of competitive bidding. The court treated half of the contractor's profits as being attributable to a diminution of competition and half not. Finding no diminution of competition in the latter half did not result in an automatic clearance because the Government had not proven that market dislocations existed; instead, the court continued to consider whether the contractor merited favorable consideration under any of the statutory factors and placed the burden upon the Government as to those statutory factors.

 ▮ That the Government, though it has the burden of showing excessive profits, does not also have the separate burden of showing absence of competition, on pain of a clearance for the contractor, also appears from others of our decisions. In *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d 499, 211 Ct.Cl. 110 (1976), an alternative basis for the clearance was the Government's failure to "cap" a statutory factor conceded to be in the contractor's favor; yet the court recognized that an uncapped factor could have inherent limits which would not produce an automatic clearance. *Id.* 544 F.2d at 510–11, 211 Ct.Cl. at 130–31. Similarly, the highest profitability on the profit hierarchy, warranted if there is a failure in the Government's proof, need not necessarily result in a clearance. *Major Coat,* 543 F.2d at 123–24, 211 Ct.Cl. at 47. *See Camel Mfg. Co. v. United States,* 572 F.2d 280, —— Ct.Cl. ——, Nos. 608–71, 38–72, 441–73, slip op. at 53 (Feb. 22, 1978).

 ▮ Overemphasis upon market structure as such is not only contrary to Congressional directives and to prior decisions of this court, but it also seems contrary to the overall scheme of renegotiation. The presence of market power by a contractor—that is, a market dislocation—does not necessarily indicate the presence of excessive profits. The contractor may not have used his market power to capture extra profits, *Major Coat,* 543 F.2d at 111, 211 Ct.Cl. at 26, or favorable consideration under a statutory factor such as contribution to the defense effort may warrant a greater than competitive return, *id.* 543 F.2d at 120, 211 Ct.Cl. at 41. Moreover, were we to accept plaintiff's position on the role and burden of proof on competition, there would be an asymmetry in the working of renegotiation—if defendant did not prove the existence of market dislocations, a clearance would be required; however, if proof of dislocations were forthcoming, it would still be necessary to undertake the traditional analysis under the statutory factors to determine if excessive profits had been earned. *Cf. A. C. Ball,* 531 F.2d at 1015–16, 209 Ct.Cl. at 262–63 (assumed distortion of competition found to still require analysis under statutory factors). We see no reason to place such an added burden upon the Government's case.

 Yet we do not wish to be seen as denying the relevance of indications of the presence or absence of competition in a particular market. A strong showing of effective competition by plaintiff, for example, might make us more inclined to credit ambiguous evidence of increased efficiency or to give greater credit for the reasonableness of costs. 50 U.S.C. App. 1213(e). In this case, however, there are enough difficulties with the evidence of full competition to preclude our giving it great weight in even this more restricted sense.

 Our fundamental difficulty with the evidence of competition in the parachute procurement market, and one which every contractor making that claim must overcome, is that the premise of statutory renegotiation is that "accurate pricing and the control of contractors' profits cannot be achieved during a build-up of production

for defense of war." *Mason & Hanger*, 518 F.2d, 1346–47, 207 Ct.Cl. at 115. The grossly increased demand, the requirement of unprecedented speed, and the predominant interest of procurement officials in volume of purchases all preclude careful cost analysis and sound purchasing. *Id.* 518 F.2d at 1347, 207 Ct.Cl. at 115–16. And if the sudden large increase in demand does not create a loss of price competition, then "the knowledge that the demand is short-term and will just as suddenly fall off surely accomplishes the task." *Major Coat*, 543 F.2d at 110, 211 Ct.Cl. at 23. The whole process of renegotiation recognizes the danger that even normally competitive markets may not continue to be so during a wartime buildup. Indeed, in *A. C. Ball*, 531 F.2d at 1016, 1014, 1015, 209 Ct.Cl. at 263, 260, 261, the "consequent distortion of the competitive market" due to the increased government demand provided the basis for recovery of some of the contractor's profits. It follows that there is no necessary correlation between the lowest bid price and the price consistent with a reasonable profit, for under such competitively imperfect conditions the lowest bid price may still permit the existence of excessive profits. *Gibraltar Mfg. Co. v. United States*, 546 F.2d 386, 393–94, 212 Ct.Cl. 226, 238–39 (1976).

Other more specific considerations reinforce our belief that the parachute procurement market may have been less than fully competitive during the peak years of Vietnam procurement. Of particular interest is the number of parachute suppliers relied upon by Mills as part of its prima facie case. In 1965, there were 57 contractors providing $27.8 million worth of parachutes; by 1967, 88 suppliers sold $62.6 million worth of parachutes, with the number remaining approximately that high in the other two review years. On its face, so many suppliers might seem to be strong evidence of effective competition in the parachute market. Yet of those eighty-eight suppliers, only

about fifteen were regularly active parachute manufacturers, of which nine or ten were recognized as established supply sources for military parachutes. During the three years under review, mills in fact competed against only thirty-five of these firms, and on the average against only 5.95 qualified bidders for each separate procurement. While we in no way indicate the number of firms required before full competition can, if ever, be found, these figures indicate that the question is closer than plaintiff would have us believe.[3] Furthermore the increase of suppliers of military parachutes during the review years may itself be evidence of the existence of large profits in this market. *See Major Coat*, 543 F.2d at 110, 211 Ct.Cl. at 23. The voluntary decision of these new entrants to leave their prior businesses to manufacture military parachutes could have been based upon the determination that the profits there realized would be greater than those made in their prior business. Given the fact that parachute manufacture was the most complex of textile manufacturing processes and that the difference between other companies and regular parachute manufacturers was considered so great that the trial judge refused to compare Mills with any other kinds of companies, there is a likelihood that these new entrants would be initially less competitive than the regular suppliers. *Cf. Gibraltar*, 546 F.2d at 390, 212 Ct.Cl. at 233 (concentration of firm on particular market found to be a major factor in its ability to be low bidder). There would thus probably have to be some significant market dislocations in the parachute industry, in the reviewing years, before these firms could enter at a competitive disadvantage.

Further indication that the evidence does not compel the finding that plaintiff's market was fully competitive is found in the set-aside program of the Small Business Administration and the Labor Department. Under these programs, qualified firms have

---

3. Indeed, we note that in *Butkin*, the contractor also worked under firm, fixed price contracts awarded on the basis of competitive bidding in a market consisting of 25–30 "exceptional" competitors. Yet the court never said the con-

tractor's profits were reasonable because it was the lowest bidder on the contracts it performed; nor did it say the Government failed in its burden because it failed to prove market dislocations.

the opportunity to match the lowest bid for a contract, taking up to 50 percent of the contract at that price. Only one among Mills' competitors, Automotive Textile Products, did not qualify under this program. Thus there may have been less incentive for each firm to submit the lowest possible price consistent with a reasonable profit because there always existed the possibility that they would be able to receive part of the contract as a set-aside. Indeed, acceptance of set aside awards would itself be evidence that the firm thought itself capable of making a profit at a price lower than it submitted in its bid. Mills accepted at least $3.2 million of such contracts over the review period. In short, the set-aside practice provides us with less than full faith in the assumption that each firm submitted fully competitive bids. *Cf. Major Coat,* 543 F.2d at 110, 211 Ct.Cl. at 23, (common knowledge of the short term nature of the wartime demand destroys competition in the market).

Just as the bids submitted need not have been competitively determined, the variance in the prices awarded for the contracts may also be indicative of the absence of full competition. For example, on January 28, 1966, Mills was awarded a contract for 1450 units of 24' personnel parachutes at a price of $85.14 per unit; on March 3, 1966, Mills agreed to manufacture, as a set aside, 8645 units of this product at $83.99 per unit. Four days later, Mills won a contract for 1450 units at $88.20 per unit. Although there are many possible reasons for this variance in prices, such a pricing pattern would not be inconsistent with less than a full competitive market.[4]

■ Finally, little weight can be given to the argument that since the government procurement officials utilized the competitively bid fixed price procurement method, they must, under the standards of the Armed Services Procurement Regulations, have known enough about the pricing of contracts in this market to insure, as in a competitive market, that no excessive profits would exist. 32 C.F.R. §§ 3–401(b)(6), 3–404.2(a)(b) (1975). Although use of this type of procurement under these standards is certainly a factor to be considered, administratively setting a felt "sound price" does not guarantee that excessive profits have not been earned. The argument is somewhat circular, for if these officials made a mistake in their judgment it would show up as excessive profits, whose existence is here at issue. Moreover, placing too much emphasis upon the decision to use competitively bid, fixed-price procurements may have the deleterious effect of decreasing the use of this type of procurement by procurement officials. *See* 32 C.F.R. §§ 3–401(b)(6), 3–404.2(a)(b) (1975).

Finding the evidence far less than conclusive that the military parachute market was perfectly competitive during the 1967–69 period, we come to consider the appropriate criteria for determining excessive profits in this case, including the specified statutory factors. 50 U.S.C. App. § 1213(e) (1970).

### III.

■ The foundation of the Government's case is its comparison of Mills' profits in the review years with the firm's profits in an earlier period. Under the Government's theory, the variance between the review and base years constitutes the amount of excessive profits earned by Mills, except for a 10% allowance whose rationale is not explained.[5] While agreeing that the historical

---

4. The absence of data from either side precludes our putting too much weight on this aspect.

5. Before the trial judge, defendant's expert could not give a precise breakdown of claimed excessive profits for each of the review years, but determined excessive profits on an accumulative basis for the three review years. This attempt to compute excessive profits for the combined three-year review period is contrary to the fiscal year basis of the Renegotiation Act. *See A. C. Ball Co. v. United States,* 531 F.2d 993, 1012, 209 Ct.Cl. 223, 258 (1976); 50 U.S.C. App. § 1215(a) (Supp. V, 1975); 32 C.F.R. § 1457.1(b) (1976); 32 C.F.R. § 1459.-9(a)–(f) (1976). Defendant attempted to remedy this shortcoming by calculating the difference between the historical return on sales and the actual profit for each of the review years and labelling 90% of such difference as exces-

norm constitutes only a starting point, the Government felt Mills merited favorable consideration under none of the statutory factors, though it was willing to give Mills some compensation for its constant efficiency; by applying the historical rate of return over a vastly expanded volume of production induced by Vietnam wartime demand, Mills would receive the benefit of its decreasing unit costs, caused by the spreading of its fixed costs over that expanded volume, as a sufficient reward for its efficiency. Thus, in effect, the historical average would constitute a ceiling on the reasonableness of Mills' profits. The other analyses performed by the Government's expert—the break-even analysis, the product-mix analysis and the profit-use analysis—are all said to "verify" the conclusions drawn from this historical norm analysis. Plaintiff, while objecting to use of the historical norm as a "ceiling," accepts the value of comparing its review year profits with those of a span of time, while differing with the Government as to the proper length of time to be used as the norm.

Defendant proposes a norm comprising Mills's earnings from 1963–66. Traditional financial analysis normally permits a five year period, but defendant dropped 1962 because it was a "low" year.[6] Such a concession benefits plaintiff because the historical norm's average is not brought down. Indeed, use of this four year period benefits plaintiff in that, other than the review years, they constitute the best in Mills' history. Plaintiff, however, proposes using a longer, nine year period for the historical norm. It is admitted by Mills that the 1964–66 period was "relatively normal." Yet the company says that, since it is a single product defense supplier and thus operates in a "cyclical market," it is inappropriate to use such a four year period; instead for such a company, the historical norm is said to require the inclusion of a low period (1961–63) as well as a high period (1967–69, the review years). Such a rounded average will avoid, it is urged, using the normal earnings as a ceiling.

■ Mills' conception of the historical norm cannot be accepted. As noted by the trial judge, plaintiff's inclusion of the review years in its computation of the historical norm results in an analytical anomaly—use of the review years in the calculation of the average against which those years are to be compared reduces the discrepancy between the review and base years, thereby defeating the very purpose of the comparison. Adjustments to the historical norm, as advocated by plaintiff, might also be counterproductive in that they could serve to justify giving greater weight to the base period ratios than they merit. Prevention of use of such an historical norm as a ceiling is best attained through proper adjustments to the norm under the statutory factors—not through attempts to second-guess the process by adjusting the calculation of the norm itself. Finally, to the extent plaintiff's position is based upon the "cyclical" nature of its business, it is misplaced. If by cyclical plaintiff means that the volume of its production in the wartime review years has risen sharply, this is a circumstance shared by most companies entering into renegotiable contracts, and was indeed a fundamental reason for enactment of the Renegotiation Act. *Mason & Hanger*, 518 F.2d at 1361, 207 Ct.Cl. at 139.

sive. Mills, aside from its basic objection to use of the historical norm as a ceiling, finds the 10% allowance arbitrary and objects to the lack of opportunity for cross-examination on this approach. To the extent that the 10% allowance is arbitrary, it is an allowance contrary to defendant's theory and works to the plaintiff's favor. As to the second objection, the calculations are so consistent with defendant's theory of the case that recalculation on a yearly basis in accord with that theory does not

seem to constitute an unfair surprise for Mills. Certainly such error under these circumstances cannot mandate a clearance for the entire review period.

**6.** In 1962, Mills' sales, its profit to sales ratio, and its profit to owners' equity ratio were substantially below the corresponding figures for the three years prior to 1962 and for the four years following 1962.

■ The trial judge, however, refused to find and compare a base period with the review period. Rather, he limited the use of historical norm analyses to situations where the company either converted from a commercial product to the military product subject to renegotiation or produced a product with both war and peacetime uses. *See Mason & Hanger,* 518 F.2d at 1367–68, 207 Ct.Cl. at 151 (dissenting opinion). Since the type and volume of parachutes sold by Mills were determined by the military uses to which they were put, the trial judge ruled that military parachutes could not be divided into wartime and peacetime products. Because Mills had never had a commercial line of business, he concluded that the earnings of the company in prior years could not be compared to the earnings of the review years.

Use of the historical norm need not be so restricted. In *Gibraltar,* plaintiff was also a single product manufacturer selling exclusively to the military. That fact did not preclude recovery of excessive profits even though the Government relied principally upon an historical norm analysis. The court there specifically endorsed the use of an historical norm. *Gibraltar,* 546 F.2d at 391, 212 Ct.Cl. at 235. The difficulty of finding other companies similar enough to be accurately compared with the company being reviewed also makes comparisons with the company's prior history particularly valuable. This is especially true where, as here, the contractor's operations during the review years are distinguishable from those of its prior history primarily through substantial differences in volume. *Cf. Gibral-*

*tar,* 546 F.2d at 391, 212 Ct.Cl. at 235. Instead of referring to the time during which the product was sold as being one of wartime or peacetime, the trial judge found determinative the party to whom the product was sold. Although Mills' demand for its product was dictated by the use to which it was put by the military, that peacetime demand was sufficient enough, and profitable enough, to induce Mills to stay exclusively in the military parachute market. *Cf. Mason & Hanger,* 518 F.2d 1349, 207 Ct.Cl. at 119 (private industry unwilling to invest in ammunitions plants because of insufficient returns). Certainly Mills, in order to secure a reasonable profit, did not depend upon sporadic wars to provide it with increased demand for its product;[7] in those circumstances the determinative factor as to the utility of base period analysis would be the time of production, not the purchaser's identity. *See Mason & Hanger,* 518 F.2d at 1360, 207 Ct.Cl. at 138. In addition, use of an historical norm as the initial step in determining the existence of excessive profits is a venerable process in renegotiation cases. *See, e. g., Butkin Precision Mfg. Corp. v. United States,* 544 F.2d at 499, 505–06, 211 Ct.Cl. at 120–21. Indeed its use is specifically endorsed by the regulations of the Renegotiation Board.[8] 32 C.F.R. § 1460.10(b)(1) (1976). Mills having conceded the general normalcy of the 1964–66 period, we see no great discrepancy in the average caused by the inclusion of 1963 within the base period, and accordingly adopt the 1963–66 period as representing Mills' base-years profitability.[9] Use of a profit-to-sales ratio and of a profit-to-net-

---

**7.** The trial judge seemed to feel that Mills' 1963–66 period was tainted because Mills in each of those years was subject to renegotiation. By adopting an historical norm, we do not imply that the clearance given those years indicates necessarily that only a reasonable, or competitive, profit was earned by plaintiff. Indeed, to the extent profits during those years exceeded the level necessary to prevent Mills from entering other markets, and, as such, arguably exceeded the competitive level, such excess would be continued in the review years.

**8.** It is unnecessary to decide the binding nature of these regulations in a de novo proceeding in

this court. *See Mason & Hanger,* 518 F.2d at 1351, n.13, 207 Ct.Cl. at 122 n.13. *Cf. Camel Mfg. Co. v. United States,* 572 F.2d 280, —— Ct.Cl. ——, Nos. 608–71, 38–72, 441–73, at —— (Feb. 22, 1978) (Renegotiation Board ruling, even if reasonable, held not conclusive upon court).

**9.** The longer period is more akin to the period accepted in traditional financial analyses. We also take note that there were no years, prior to the review years, that were better than these, and that 1966 seems to be particularly favorable to Mills.

worth ratio [10] constitutes the two most frequently used devices in renegotiation to measure profit relationships statistically. Mills' average rates of return on sales and on beginning net worth for the four-year historical base period were 7.95% and 58.7% respectively. Applying each historical ratio to the sales and beginning net worth of each review year yields the following results:

Sales ratio:

| Year | Sales | | Historical Rate of Return | | Base Period Level of profits |
|------|-------|---|------|---|------|
| 1967 | 13,376,000 | × | 7.95% | = | 1,063,392 |
| 1968 | 10,256,000 | × | 7.95% | = | 815,352 |
| 1969 | 11,346,000 | × | 7.95% | = | 902,007 |

| Year | Actual Profit | Less | Base Period Level of Profits | | Variance between base & review years |
|------|------|------|------|---|------|
| 1967 | 1,827,600 | – | 1,063,392 | = | 764,208 |
| 1968 | 1,466,170 | – | 815,352 | = | 650,818 |
| 1969 | 1,252,250 | – | 902,007 | = | 350,243 |

Net Worth Ratio

| Year | Beginning Net Worth | | Historical Rate of Return | | Base Period Level of profits |
|------|------|---|------|---|------|
| 1967 | 1,994,625 [11] | × | 58.7% | = | 1,170,874 |
| 1968 | 2,014,000 | × | 58.7% | = | 1,182,218 |
| 1969 | 2,539,000 | × | 58.7% | = | 1,490,393 |

| Year | Actual Profit | Less | Base Period Level of Profits | | Variance between base & review years |
|------|------|------|------|---|------|
| 1967 | 1,827,600 | – | 1,170,874 | = | 656,726 |
| 1968 | 1,466,170 | – | 1,182,218 | = | 283,952 |
| 1969 | 1,252,250 | – | 1,490,393 | = | (238,143) |

Both of these ratios serve different functions and obviously they can lead to differing results. The profit-to-sales ratio shows profitability in relation to the dollar volume of business done. As an analytical tool, it is especially useful in those types of businesses that are not capital intensive, where there is a rapid turnover of expensive retail inventory, or where a significant portion of the facilities or materials are furnished by

**10.** The second numbered statutory factor specifically requires profits to be considered in relation to net worth. 50 U.S.C. App. § 1213(e)(2).

**11.** Renegotiation Board regulations provide that the amount of net worth employed, as a general rule, will be that existing at the beginning of the fiscal year. Where there have been significant changes in any particular year, an average of the beginning and ending values may be more indicative of the amount of plaintiff's equity than the beginning value taken alone. *Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 350, 208 Ct.Cl. 704, 747 (1976). Mills had considerable changes in net worth between the beginning and the end of 1967. Beginning net worth was $1,563,902 and ending net worth was $2,425,476. In view of the significant change in net worth during 1967, it may be appropriate that adjustments be made to reflect the amount employed during the year by adopting the average net worth for fiscal year 1967, or $1,994,675. This amount is largely, but not entirely, exclusive of nonbusiness related investments because it was agreed that the amounts and timing of nonbusiness related investments in 1967 necessitated special adjustments. As a result of these adjustments, the 1967 closing business related net worth was $2,425,476. Were we to ignore both these nonbusiness investments and the addition of net worth during 1967, beginning net worth would be $1,563,902, resulting in a variance of $898,380. The adjustments are favorable to Mills.

the Government or the customer. Contrarily, rates of return on net worth and on capital employed relate profits to the value of total assets and investments employed in the business and provide a convenient way to measure profits on the owners' financial commitment to company business. Thus all nonbusiness related investments are excluded from the computations on net worth. The ratio of profit to net worth is most useful to measure profitability when the business requires an extended period to recover its costs. Its utility is less when a substantial part of the plant and materials comes from government-furnished facilities or government-furnished property and the owners provide essentially management functions. Generally, investment ratios have limited utility in businesses where capital accounts for a minor part of volume and profit in relation to the personal services involved in management and organizational functions.

While both ratios are to be considered, these considerations require our giving slightly greater weight in this instance to the profit-to-sales ratio.[12] First, plaintiff specifically refers to itself as a non-capital intensive industry. Brief at 31. Secondly, the issue in this case largely concerns the increased volume produced during the review years. Since fixed productive assets would not change significantly and since we are told that the increased volume was largely the result of increased utilization of assets, the primary input for this increased volume would be increased managerial skill. Our concern with the increased volume would make profitability in relationship to dollar volume of business the more significant standard. The profit-to-sales ratio most accurately reflects these concerns. Thirdly, although the net worth ratio excludes most of the investments made by Mills outside the parachute business, the ratio still includes a significant amount of cash on hand. Although some cash on hand is necessary to run any business, significant amounts of such cash will not measure profits on the owners' financial commitment to company business, which is one of the prime reasons for using the net worth ratio.[13] Finally, as seen in the above calculations, a significant increase in net worth over a year may require using an average of the beginning and ending net worth for that year, a process which indicates less than complete confidence in the figure chosen. Moreover, each succeeding year's ratio builds upon the previous year's addition to net worth, whose very size may also be an indication of excessive profits being made in the year of addition. Since the previous year's addition to net worth may have been made partially, at least, from profits that were excessive, the profit ratio for the succeeding years' net worth may be artificially low because the net worth base was mistakenly high. The difference in ratios will become important in the discussion of intra-industry comparisons, *infra*.

### IV.

Of the statutory factors, 50 U.S.C. App. § 1213(e), the most important in this case is the one concerning efficiency. Were we to find that Mills did not warrant favorable consideration for efficiency due to its control of variable costs during the review years, our decision would be much simpler. In *Gibralter Mfg. Co. v. United States*, 546 F.2d 386, 212 Ct.Cl. 226 (1976), the Government principally relied on a historical norm analysis to carry its burden of proof.[14] For the first year under review, production tripled largely as the result of the contractor's

---

12. The trial judge, while agreeing that both ratios must be considered, adopted the profit-to-net worth ratios when making comparisons with other firms and never specified why the profit-to-sales ratio was unacceptable.

13. Our calculations from defendant's table on use of profits, *see infra,* indicate that cash on hand constituted almost 38% of the net worth for 1967, 39.45% for 1968 and 26.8% for 1969.

14. In *Gibraltar,* the pre tax profit-to-sales ratio was 15.18%, while the average return during the historical norm was 6.01%; here the average historical return is 7.95%, while the review year returns are 13.7%, 14.3% and 10.5% respectively.

use of multiple shifts. While finding favorable recognition for efficiency was due plaintiff for its exceptional effort, 32 C.F.R. §§ 1460.10(b)(3), 1460.9(b) (1976), the court found that the evidence, particularly the historical norm analysis, indicated that plaintiff had realized some excessive profits. *Id.* 546 F.2d at 393, 212 Ct.Cl. at 239. We would find similar considerations convincing in this case were it not for Mills' claim that it also deserves credit for its tight cost controls indicating increased efficiency, a claim not presented in *Gibraltar.*

Thus it becomes crucial whether Mills' increased profitability during the review years can be attributed largely or entirely to an increase in efficiency. The parties have stipulated that the Company was one of the most reputable and efficient parachute manufacturers during both the base and the review periods. The Government contends that Mills failed to increase its efficiency during the review years and that this failure, in a period of stable or decreasing prices, leads to the conclusion that Mills' increased profits resulted from the lower unit costs caused by both the spreading of its fixed costs over the doubled volume of wartime production, and by changes in its product mix in favor of the less complex flare parachute. Both causes would be the direct result of the Government's· wartime demand, entitling the Government to share in the increased profitability. 32 C.F.R. § 1460.10(b)(3) (1976). Implicit in the Government's position is the postulate that favorable recognition for efficiency cannot be given if a relative increase in the firm's efficiency cannot be shown during the review years. The trial judge interpreted the Renegotiation Act as not requiring such an increase in the contractor's efficiency during the review years. Nevertheless, he found that Mills had in fact increased its efficiency during that period. Two factors formed the basis of that opinion: (1) increased utilization of plant through use of multiple shifts; and (2) maintenance by Mills of both quality production and control

of overhead costs during substantial changes in sales volume.

 We have often noted the essentially comparative nature of the renegotiation process. *See, e. g., Major Coat,* 543 F.2d at 102, 211 Ct.Cl. at 9. Comparisons are of two types—those made with the firm's own prior history and those made with other outfits within the industry, adjustments being made for both qualitative and quantitative differences. 32 C.F.R. § 1460.10(b)(1) (1976). When we compare Mills' review year profitability with its prior profitability we are concerned, under the statutory factor of efficiency, with increases in its efficiency during the review period. To the extent the firm is equally efficient, however measured, in the base and review years, we would expect the profitability of the base years to incorporate an adequate return for that level of efficiency.[15] Plaintiff's acceptance of the 1964–66 period as one of relative normalcy seems to us to concede as much. Similarly, the profitability of the base period indicates, to some extent at least, how the marketplace rewarded Mills for its efficiency vis-a-vis its competitors; again, plaintiff's acceptance of the 1964–66 period provides no reason for us to doubt this. Our concern with changes in the level of efficiency during the review years is not new; it is the necessary result of the recognition that efficiency in some absolute sense does not exist in any business, *Major Coat,* 543 F.2d at 116, 211 Ct.Cl. at 34, but is a comparative concept. We have already endorsed the principle of crediting, in general, only increases in the statutory factors. In *Major Coat,* 543 F.2d at 117–18, 211 Ct.Cl. at 37, compensation for the risks common to all compared firms was not merited because those risks would have been internalized in the firms' profit figures. Having asserted that we are concerned primarily with changes in efficiency, we hasten to add some qualifications. First, it is clear that under prior decisions of this court, *see Lykes Bros. S. S. Co. v.*

15. Indeed, application of the historical rate of return over a doubled volume of sales may provide an added recovery for Mills.

*United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972), it cannot be plaintiff's burden to establish an increase in efficiency. Once plaintiff has met its prima facie burden for such favorable consideration under this factor, it is the Government's burden to establish the lack of increased efficiency during the years under review. Secondly, concern with increases in efficiency should not result in undue emphasis upon base period averages. *A. C. Ball,* 531 F.2d at 1015–16, 209 Ct.Cl. at 263; *Major Coat,* 543 F.2d at 114, 211 Ct.Cl. at 31; wide variations in the years forming the average, or other considerations, might have to be noted and accounted for.

▮ The first asserted basis for crediting Mills with increased efficiency is the more intense utilization of plant through use of multiple shifts. By itself, increased utilization of plant is not an increase in efficiency. Although the Board's regulations under this factor indicate favorable consideration is due for "exceptional effort," 32 C.F.R. § 1460.10(b)(3) *see Gibraltar,* 546 F.2d at 393, 212 Ct.Cl. at 237–38; it is difficult to put much weight on increased utilization alone, since any increased volume of production during short periods of time will be achievable primarily through increased utilization of assets. Significant credit for such increased effort requires more than a mere increase in asset utilization.

Intensive asset utilization, however, does evoke increased efficiency if the contractor is able to control diseconomies resulting from the attempt to produce more volume from a fixed asset base; this is the second of the asserted bases for finding increased efficiency. The ability to decrease controllable costs, or to even maintain them at an absolute or relative level of stability as production increases may very well indicate increased efficiency. *See Major Coat,* 543 F.2d at 117, 211 Ct.Cl. at 35–36. The contractor's ability to control costs will be best measured by comparisons with the firm's prior history or with the contemporaneous experience of comparable firms. The fail-

ure ʼof Mills during the base period to increase its sales so greatly or to sell at a volume as high as that reached during the review period limits our ability to make meaningful comparisons with its prior history. Comparison of Mills' overhead as a percentage of sales with that of Mills' competitors, however, indicates a probable increase in efficiency by plaintiff during the review years. Specifically, the trial judge found that controllable expenses included in Mills' "other costs" were kept at lower levels than by other parachute manufacturers producing comparable volumes:

"Other Costs" As % of Sales—Mills and Competitors

| Company | Year | | | |
|---|---|---|---|---|
| | 1965 | 1967 | 1968 | 1969 |
| Mills | 8.8 | 7.4 | 9.6 | 9.4 |
| M. Steinthal | 12.9 | 10.5 | 12.5 | 18.5 |
| Pioneer Aerodynamic Systems | 15.1 | 21.1 | 27.4 | 29.3 |
| Switlick | 16.7 | 19.9 | 22.7 | 11.7* |
| Pioneer Parachute Co. | 31.4 | 35.2 | 38.9 | 30.0 |

* Loss year

The relevant comparison, we note, is not with the absolute values of the above percentages, but with their change from the base period. Thus in 1965, a year of less than average profitability for Mills, its costs remainder was a full 32% less than the nearest competitor here shown. To the extent that this differential is due to tighter control of variable costs, the profits of that concededly normal year should take this into account. In 1967 and 1968, the differential between these two companies remained about the same; indeed in 1968, plaintiff's ability to control these costs vis-a-vis this competitor declined relatively by 8% over the 1965 period. But by 1969, the review year of least profitability, Mills was able to control its variable "other costs" so that they were only about 50%, as a percentage of its sales, of its nearest competitor's (here shown).

Conspicuous among the firms not shown in the above table, are two that provide significant intra-industry comparisons: Au-

tomotive Textile Products and Security Parachute. They show the following:

| | 1966 | 1967 | 1968 | 1969 |
|---|---|---|---|---|
| Mills | 8.8 | 7.4 | 9.6 | 9.4 |
| Automotive Textile | 7.9% | 6.3% ** | 8.5% | 10.9% |
| Security Parachute | | 12.1% ** | | |

** Year found to contain excessive profits.

As compared to Mills in both absolute and relative terms,[16] Automotive was able to control its costs better than Mills in 1967 and 1968,[17] but not in 1969. Furthermore, the low level of the "other costs" in 1967, and the large reduction from the previous year, did not preclude the Renegotiation Board's determination that Automotive Textile had earned excessive profits of $400,000 on sales that would have to be increased 2½ times to equal those of Mills' in the same year.

There are, of course, difficulties with this analysis which tend to be stressed by the party feeling most harmed by the data. The data is unaudited. Only one base year was involved and individual companies are being compared. "Other costs" include fixed costs which do not change as the production volume varies and which, not being continuously controllable, are not as indicative of efficiency. The percentages do not account for variances in the sales volumes of the companies or the rate of increase of the volumes on the fixed asset base. For example, Mills' ability to keep costs as a percentage of sales at 9.6% might be more significant if its sales had doubled on a fixed asset base while other firms attempting to so double their volume had significantly larger relative increases. Alternatively, the constancy of the percentage ratio may be deceptive because a doubling of an already large sales base permits a large absolute increase in these other costs before the percentage level increases.

 Defendant, having the ultimate burden of proof in renegotiation, must bear the adverse implications of the thinness of the comparative data, unless the absence of data were the contractor's responsibility. The above data is less conclusive than we would desire; it certainly does not establish that Mills does not merit favorable consideration for increased efficiency during the review years. On the whole we are favorably impressed by Mills' ability to control its costs when compared with several members of its industry, and we are sensitive to the Renegotiation Act's emphasis on the control of these costs. But we conclude, nevertheless, that the Government has established that Mills' increased profits were not entirely the result of its increased efficiency. Thus, we find that Mills merits favorable consideration for efficiency but are not persuaded that its efficiency precludes the possibility of its having earned excessive profits in the circumstances of this case.

### V.

Defendant undertook a profit-use analysis in order to verify its conclusion that the bulk of plaintiff's increased profits was due to economies of scale rather than considerations meriting credit under the statutory factors. It is not disputed that Mills' gross nonparachute business investments grew substantially during the review years. They were $20,444 in 1966; in 1967, they increased to $660,044, and by 1969 they were $1,055,651. When Mills' cash on hand

16. In 1966, other costs of Automotive were 10.2% less than Mills' other costs. By 1967 this had increased to 14.9% and in 1968 it was still 11.5% less than Mills. We recognize that these percentages are of sales and that the two firms had different sales volumes through these years. As such we do not put great weight on the fineness of the differences in the above percentages. They do however provide valuable, but rough, insight into comparable efficiencies.

17. The base year here compared with is 1966 because Automotive Textile did not make sufficient sales in this market to be subject to the Renegotiation Act in 1965. Mills' other costs as a percentage of sales were identical to its 1965 figure of 8.8%. We recognize the difficulty in making the switch in base years and appropriately discount the weight we give these numbers.

is also considered, the results are even more dramatic:

| Year | Cash On Hand | External Investments | Total | Percentage Of Total To Net Worth |
|------|------|------|------|------|
| | (1) (000) | (2) (000) | (1+2) (000) | |
| 1966 | $ 125 | $ 23 | $ 148 | 9% |
| 1967 | 957 | 660 | 1,617 | 64% |
| 1968 | 1,266 | 820 | 2,086 | 65% |
| 1969 | 1,005 | 1,056 | 2,061 | 55% |

In the review period, Mills also retained from its earnings and added to its parachute business a total of $2,157,000. Additions to Mills' beginning net worth in the parachute business averaged 27.9 percent annually in each of the review years.

Although such evidence does not establish in itself that Mills fails to merit favorable consideration under the statutory factors, the sheer magnitude of the cash on hand, the annual increases in net worth, and the external investments during wartime procurement, all cause us to (1) be less certain of the extent of favorable consideration given under the particular statutory factors, and (2) be more hospitable to the idea that plaintiff's profits during the review years arose, not from factors for which it was responsible, but from wartime conditions which tend to enhance its gain.

## VI.

As we have pointed out, the Government's case rests principally upon its historical norm analysis. Two other tests were used by the Government to buttress its claim that excessive profits had been earned—a break even analysis and a product mix analysis. The trial judge rejected both of these analyses, and we shall mention them but briefly.

An essential quality of firm, fixed price contracts is that the contractor assumes responsibility for his costs, with the inevitable risk that greater costs than anticipated will be incurred and that a loss on the contract can result. *A. C. Ball*, 531 F.2d at 1007, 209 Ct.Cl. at 248–49; 32 C.F.R. § 1460.12(b)(1) (1976). Yet the assessment of risk is essentially a comparative exercise. The presence of risks common to all firms will not entitle the contractor to more or less profit than is merited by an otherwise comparable firm; compensation for those risks, to the extent the market will permit, should be already internalized in the comparable firm's profit figure. Thus favorable recognition must require an increased assumption of risks, as it did with efficiency. *Major Coat*, 543 F.2d at 117–18, 211 Ct.Cl. at 37. Defendant's break-even analysis was an attempt to measure the extent of risk Mills assumed when it responded to invitations for bids on government parachutes by determining the level of sales needed to recover continuing fixed costs. Once that level was reached, recovery of direct costs would be the major element of risk in accepting additional business. Mills would thus, it is said, have a great degree of flexibility in selecting the type of solicitations to which it wished to respond and in pricing its bids for government business; any price that was above the direct cost of material and labor would yield profits. Essentially the analysis attempts to indicate at what point in time one less variable need be accounted for in bidding and accepting new contracts.

The data is simply too sparse to support this theory. Similar data from comparable firms is lacking, precluding appraisal of Mills' relative risks; earlier break-even points in 1967 and 1968 than in 1965 and 1966 may be more the result of Mills' ability to control variable costs, other than direct costs for material and labor, over a vastly expanded volume of production; the earlier points may simply be the result of an expanded volume, or of changes in Mills' product mix, with some types of parachutes contributing more to profits and overhead; or they may be the result of any combination of these factors. The trial judge rejected the analysis because there also was no evidence that Mills was either cognizant of or utilized the flexibility claimed by this analysis. While we are less sure that the standard is completely subjective, *cf. Major Coat*, 543 F.2d at 118, n. 7, 211 Ct.Cl. at 38 (risks must be more than speculative to be considered), our end-appraisal of the weakness of the analysis is the same as the trial judge's. Since plaintiff has neither introduced evidence of, nor claimed recognition for, increased risks during the review period, any risks Mills undertook will be com-

pensated through use of the historical norm as a starting point and through intra-industry comparisons.

The defendant's product-mix analysis also fails in this instance to provide adequate support for its claim that Mills earned excessive profits in the review years. In that analysis defendant's expert contended that the increase over previous years in the percentage rate of Mills' contribution to profit and overhead for the years 1967–69 [18] was due either to an increase in Mills' efficiency, to increased prices, or to a change in the mixture of types of parachutes manufactured and sold. After concluding that there was no increase in Mills' efficiency and that prices remained relatively stable, defendant's expert contended that, in Mills' case, some products contributed more to overhead and profit than did others and that the increase in the percentage rate of Mills' contribution to profit and overhead was attributable to the increases in volumes of the simpler flare parachutes in the review period.

Our finding that Mills in fact increased its efficiency casts much doubt on the validity of the analysis. Furthermore, a proper analysis would determine the unit costs of the various categories of parachutes so that the effect on costs and profits of varying the product mixes could be measured. Were this test more central to our decision, we might consider the Government's asserted inability to perform a proper analysis because Mills did not keep detailed cost accounting data.[19] As it is, we put aside for this case the product-mix test, resting our decision on other factors and considerations.

## VII.

Initially, plaintiff sought to evaluate Mills' performance through comparisons with commercial textile fabricators, relying upon Board Regulations 32 C.F.R. §§ 1460.-2(c) and 1460.10(b)(1) (1976). The trial judge found differences with these companies significant enough to preclude their comparison with Mills' operations for the purposes of renegotiation. Mills does not dispute this decision, nor do we. The trial judge's comparison was limited to other government parachute suppliers, and it was discovered that the post-renegotiation returns on net worth and capital of two competitors exceeded the pre-renegotiation ratios of Mills for the review years. Specifically, in 1967, Mills had a return on beginning net worth of 116.9 percent and on average net worth of 91.6%. In that year, Automotive Textile Products Co., Inc., had its initial return on net worth of 350 percent reduced to 188 percent after renegotiation; Security Parachute Company had its return on net worth of 264 percent reduced to 219 percent. (Comparable information is not available for any other parachute manufacturers.)

Defendant's response is an elaborate argument to the effect that comparisons cannot be made with other members of the parachute industry because that data reflects the noncompetitive conditions in the entire market brought about by the increased wartime demand. As proof that noncompetitive conditions existed, defendant presented evidence of a higher profit ratio on an expanded sales volume for the entire industry, and relied upon a statement in *Major Coat*, 543 F.2d at 110, 211 Ct.Cl. at 23, that such a rise *may* show the absence of competition.

The Government's argument misses the full significance of the comparisons made by the trial judge.[20] It is true that measur-

---

**18.** The rates, calculated in defendant's break-even analysis, were: 16.9% (1965); 18.4% (1966); 21.1% (1967); 23.6% (1968); 20.1% (1969).

**19.** *Cf. Camel Mfg. Co. v. United States*, 572 F.2d 280, —— Ct.Cl. ——, Nos. 608–71, 38–72, 441–73 at ——, ——, —— & n. 21 (Feb. 22, 1978) (burden of proof, and thus the risk of

non-persuasion, for accounting data placed upon contractor).

**20.** Earlier we argued that there may be strong indications of the absence of competition in the parachute market. Such arguments were presented in rebuttal to the proposition that the method of bidding for these contracts assured, at least presumptively, the presence of a rea-

ing the reasonableness of a contractor's profits against the noncompetitive profits of others is futile. *Major Coat*, 543 F.2d at 109–10, 111, 211 Ct.Cl. at 23–25. Indeed, in *Major Coat*, the court found that the potential imperfections in the market caused by wartime demand and consequent pressure on industrial capacity, evidenced by the use of rated orders, precluded comparing that contractor with other firms producing the same product. Here, however, comparisons have been made only with the after-renegotiation profit rates of other parachute manufacturers.[21] The post renegotiation profit figures supposedly remove any excessive profits realized in the firms' review years and thus theoretically provide a standard against which Mills' review year performance can be measured. *Major Coat*, 543 F.2d at 121, 211 Ct.Cl. at 43. The demonstrated closeness of the underlying firms' operations and risks to those of Mills make these figures even more probative of what a comparable competitive profit would be. *Id.* 543 F.2d at 121, 211 Ct.Cl. at 42. One difficulty, however, in our use of these figures is our lack of knowledge of what information was before the Board and what changes, if any, it made in accepting profits at these levels. Yet plaintiff's own introduction and acceptance of the reasonableness and comparability of these profit figures to its own competitive earning power, *id.* 543 F.2d at 123, 211 Ct.Cl. at 47, justify the comparison.

When we compare the post-renegotiation profit-to-sales ratios, which we have found to be the more significant ratio in this case, of these two competitors with Mills' sales ratio, the results differ from those previously noted. Automotive Textile had its pre-renegotiation profit-to-sales ratio of 16.2 reduced to 9.4; Security Parachute's ratio was reduced from 16.4 to 14.0. Mills' pre-renegotiation ratios for the 1967–69 review period are 13.7, 14.4 and 10.8 respectively.

Were we merely to average the after-renegotiation ratios of these two firms (*i. e.* a sales ratio of 11.7), some refunds for 1967 and 1968 would appear in order. Were we forced to place greater emphasis upon one firm's ratio than the others', we would note that Automotive Textile had previous and subsequent years subject to renegotiation, while Security Parachute has had only this year with sales in the parachute market above the statutory minimum. Furthermore, Automotive Textile was able to control its other costs even better than was Mills and would presumably have deserved even greater credit for efficiency. Use of the 11.7 sales ratio would result in excessive profits for Mills of $293,400 in 1967, and $297,900 for 1968. Use of the 9.4 sales ratio would amount to excessive profits of $628,800 for 1967, and $554,000 for 1968.

## VIII.

The Government has persuaded us that Mills earned profits during the review years that were excessive. Evidence of wartime market imperfections has precluded our accepting the reasonableness of Mills' profits from the competitively bid nature of its procurement. The historical norm analysis, whose base period was essentially conceded to be one of relative normalcy by Mills, provides our starting point. From there we assessed whether consideration under the various statutory factors was already encompassed within that norm or whether additional consideration was merited. Mills' risks were found to be already adequately compensated through use of the historical norm and through intra-industry comparisons, but some additional favorable consideration was found due for Mills' increased efficiency in cost control. But we noted also, that a comparable firm found to be equally efficient was held to have earned $400,000 in excessive profits for 1967. We have considered all the remaining statutory

---

sonable profit. They fell far short of establishing the absence of competitive factors sufficient to preclude use of any intra-industry comparisons during the review years.

21. This proceeding is *de novo*, and the prior decisions of the Renegotiation Board are not

conclusive. The suggestive use of the Board's judgment, however, is permitted and does not prejudice the de novo character of this proceeding. *Gibraltar Mfg. Co. v. United States*, 546 F.2d 386, 388, 212 Ct.Cl. 226–29 (1976).

factors and find them to be either adequately compensated by application of the historical norm and intra-industry comparisons, or not claimed here, or not pertinent to the facts of this case. As we see it, economies of scale caused by the increased volume of production during wartime competitive dislocations, changes for which Mills was not responsible, were partly responsible for the company's increased profitability during the review years. In short, the tremendous increase in wartime demand, the evidence of market imperfections, and the size of the increase in external investment, cash on hand, and additions to net worth, when combined with the difference in Mills' earnings and those of firms which Mills introduced as comparable, convince us that Mills earned excessive profits in 1967 and 1968. For 1969 we hold that no excessive profits were earned.[22] The court has indicated that the determination of the amount of excessive profits is very far from an exact science and that, very often, a broad-brush technique or general estimate is called for. *See A. C. Ball Co. v. United States*, 531 F.2d at 996, 209 Ct.Cl. at 229–30; *Dynasciences Corp. v. United States*, 214 Ct.Cl. 643–669 (1977).[23] In this instance our best judgment on the whole case is that plaintiff earned $425,000 in excessive profits in 1967 and $350,000 in 1968. This holding puts Mills' profit-sales-ratio at 10.8 for 1967 and 11.3 for 1968, figures which compare favorably with its competitors and are not ungenerous when compared with the company's previous history. For 1969, as we have said, we grant a clearance.

## CONCLUSION OF LAW

The court concludes as a matter of law that for the 1967 and 1968 fiscal years plaintiff realized excessive profits in the gross amount of $425,000 and $350,000 respectively, from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. For those years, judgment is hereby entered on defendant's counterclaim in the sum of seven hundred seventy-five thousand dollars ($775,000) less appropriate state and federal tax credits, plus interest thereon as provided by law. The court also concludes that the plaintiff realized no excessive profits from contracts or subcontracts subject to renegotiation during its fiscal year 1969; with respect to that year defendant's counterclaim is dismissed.

---

**22.** It should be remembered that (a) under the net-worth ratio 1969 would be a clearance year, (b) in 1969 Mills apparently controlled its costs better than in the other review years and better than its main competitor, and (c) under the profit-sales formula, Mills' ratio for 1969 was less than that of the average of its two prime competitors.

**23.** In *Major Coat*, 543 F.2d at 124, 211 Ct.Cl. at 48, we also indicated that, in a case like this, we would for a limited time not hold the defendant rigidly to the strict standards of proof theoretically called for by *Lykes*.