**MANUFACTURERS SERVICE CO., INC.**

v.

**The UNITED STATES.**

No. 336–74.

United States Court of Claims.

July 14, 1978.

---

Before DAVIS, NICHOLS and KASHIWA, Judges.

## OPINION

DAVIS, Judge:

The Renegotiation Board determined that plaintiff Manufacturers Service Co., Inc. (MSC) realized excessive profits of $110,699 during its 1967 fiscal year (Jan. 1, 1967–Nov. 11, 1967), excessive profits of $145,862 during FY 1968 (Nov. 12, 1967–May 31, 1968), and excessive profits of $161,718 during FY 1969 (June 1, 1968–May 31, 1969). Before Senior Trial Judge White, plaintiff contended that it deserved a clearance for each of these years while the Government sought a determination of an even greater amount of excessive profits. The trial judge held that the Government had not met its burden of proof and that plaintiff therefore merited a clearance for each of the renegotiable years. We cannot agree with that result and find that the company realized excessive profits of $80,300 in 1967, $111,104 in 1968, and $90,876 in 1969.[1]

## I

Manufacturers Service Co. was established in 1956 by Foster Irish as a sole proprietorship. Prior to that time, Mr. Irish was employed as a comptroller at Plymouth Industrial Products (PIP) which primarily manufactured plastics and specialized in the production of supports used in the packing of artillery ammunition for the Government. Foster Irish joined PIP in 1954 at the urging of a former acquaintance, Aldred Simmons, PIP's founder and president, at a time when PIP was in extremely poor financial condition. For the initial three or four months of employment, Mr. Irish worked without pay and even loaned PIP about $10,000 to assist it in

---

1. The findings of the trial judge, somewhat modified, are reflected in this opinion.

meeting its payrolls and other expenses. When Mr. Irish left PIP in 1956 to form MSC, it was at the urging of Mr. Simmons. At that time, PIP lacked both the technical and financial ability to set up and operate its own metal shop, and no other local metal stamping concern would sell PIP any stampings due to its precarious financial situation. Mr. Irish formed MSC specifically to supply PIP with the stamped metal inserts needed for the production of various packing supports, even though he had no prior experience in the metal stamping field. MSC commenced operations in a room rented from PIP and purchased start-up equipment, molding and dies from that company as well. Throughout its active existence, MSC produced only these formed metal inserts and then only in response to formal firm, fixed-price purchase orders from PIP. Indeed, during the review years at least, MSC never attempted to find additional customers and in fact functioned as a near sole source metal insert supplier to PIP. In 1959, MSC became a partnership with Mr. Irish's son, Donald, becoming the only other general partner and some trusts, apparently connected with PIP's president, Mr. Simmons, becoming limited partners. In November 1967 MSC was incorporated, with all of the stock being held by both Irish's.[2]

In June 1966, prior to its incorporation, MSC moved to expanded facilities in anticipation of large increases in its business resulting from the development of a different type of packing support for artillery ammunition known as the "combination ring." The concept of the combination ring originated solely from Mr. Simmons who, through his experience and contacts developed as an Army officer during World War II, knew of the Government's dissatisfaction with existing types of ammunition packing supports. His idea of a combination ring consisted of an 18-gauge curled

and plated ring (the material of this ring being curled back on itself within the inside diameter) joined by means of a crimping operation to a 14-gauge flat ring of larger diameter, and with the assembled unit then being encapsulated in an asphalt-asbestos compound. Although conceived prior to 1960,[3] it was not until March 1966 that Mr. Simmons obtained an authorization from the Picatinny Arsenal for use of his ring as an alternative support in the packing of 105mm artillery shells. A problem existed in preparing for the mass production of this combination ring in that tooling capable of satisfactorily manufacturing in quantity the 18-gauge curled ring component of the combination ring apparently did not exist in the immediate locale of PIP and MSC (Sheboygan, Wisconsin).

In 1960, at the request of Mr. Simmons and in the joint belief that there would be a future need for quantity orders of the combination ring, MSC began its attempt to develop tooling capable of mass producing the 18-gauge ring. In 1961, MSC retained the services of a local machine shop to develop a progressive die suitable for mass production of the ring. The resulting die did not, however, properly form the necessary curl. MSC proceeded to remove stations from this die, and then used the stations in separate presses to produce about 300,000 curled rings for PIP during the 1962–65 period. This production process was inefficient—it was more time-consuming than a process utilizing a suitable progressive die mounted on a single press would have been. During the 1962–65 period, MSC made little, if any, progress toward obtaining a progressive die that would be suitable for mass production. During this time, MSC's efforts consisted of the on-and-off, trial-and-error work of its principals, neither of whom had any formal training or prior experience in the fields of engineering, mechanical drawing, metallur-

---

2. In that year, Mr. Simmons surrendered day-to-day control of PIP when the controlling interest was purchased by Ametek, Inc.

3. Simmons had previously succeeded in having the curled ring approved by Picatinny Arsenal

in 1958 for use in packaging 90mm and 105mm ammunition. At that time however, there was no existing Government need for production quantities of the curled ring.

gy, die designing, or die making. Although there was no substantial demand for the curled ring or combination ring at the time, the Messrs. Irish did devote time, effort, and money to the solution of the problem.[4] They did not, however, ever attempt to utilize any of the component die makers located in such close cities as Chicago, Milwaukee or Detroit because the then-existing low demand was felt not to justify the effort and because of fear that another company would copy the process, if developed, and compete with MSC for PIP's business. By the early part of 1966, Aldred Simmons informed MSC of his confidence that the combination ring would soon become an authorized item for use in the packaging of artillery ammunition, and that there would be a large demand for it. Around this time, Foster Irish conceived of the idea of cutting out an hourglass-shaped piece from the material as it passed through various punches of a progressive die, thereby relieving the stress on the remaining material as the die executed various succeeding punches. MSC engaged another local company, Badger Machine Company, to build a prototype die utilizing the hourglass-cut function. The Badger die was not immediately successful in producing an acceptable curled ring, and after devoting substantial effort to correct the deficiencies of its die with respect to the formation of a proper curl, Badger gave up and was discharged by MSC. Soon MSC engaged the services of Plymouth Die Mold, a local company whose history and association with PIP were similar to MSC's.[5] That company reordered the stages of the Badger die and, by mid 1966, only a few months after being informed of the impending Government authorization, a die capable of mass-producing a proper curled ring had been developed.

Shortly thereafter in late 1966, PIP received its first large order for the encapsulated combination ring, and shortly MSC accepted its first comparable order for combination rings. Except for the plating of the 18-gauge curled ring, MSC began filling this order by itself producing the entire combination rings. MSC soon realized that its recently expanded facilities were inadequate to meet the expected future demand for combination rings, and in the latter part of 1966, elected to utilize subcontractors in lieu of further enlarging its own facilities to meet the expected demand. The decision to subcontract was influenced both by the desire to avoid the financial risk of such expansion[6] and by the recognition that such expansion would have postponed its ability to meet the growing Government demand.

As a result of its decision to subcontract, MSC produced combination rings by assembling and crimping together 18-gauge curled rings and 14-gauge flat rings that had been manufactured and plated (in the case of the 18-gauge curled rings) by subcontractors. Only local firms were approached by MSC for subcontracting and apparently MSC utilized every stamping and plating firm available in its locale. One such subcontractor manufactured both 18-gauge curled rings and 14-gauge flat rings; a second manufactured only 14-gauge flat rings, while a third made only 18-gauge curled rings; a fourth plated all the 18-gauge curled rings fabricated by the other subcontractors. After such manufacture of the 14-gauge and 18-gauge rings, and after the latter were plated, MSC performed the crimping operation necessary to form the combination rings. Thus a large portion of MSC's production effort was undertaken by these subcontractors.[7]

4. Aldred Simmons and certain PIP employees cooperated with MSC during this time by devoting some time, thought and physical effort to the project, but it does not appear such help was substantial.

5. As was true with MSC, Aldred Simmons had a role in forming Plymouth Die Mold, whose principal function throughout the 1960's was to supply molds to PIP for use in the latter's operations.

6. It would have cost MSC between $150,000 and $200,000 to tool up for in-house production of the combination rings.

7. In FY 67, 78% of MSC's cost of sales was from the purchase of materials and work that

MSC's decision to subcontract locally did not, however, relieve it of all responsibilities. MSC still had the overall obligation of making sure that the raw material needed by its subcontractors was ordered, and that the subassemblies were scheduled, completed and delivered to it in time to permit it to assemble and deliver the combination rings to PIP on time. MSC thus saw to it that the manufacturing subcontractors had enough steel on hand to make the rings, that their production was continuing, and that deliveries would be on time; it also checked with the plating subcontractor to make sure that the plating operation was proceeding on schedule and that this subcontractor would have an adequate inventory of 18-gauge curled rings for MSC's use. Indeed, this demand for coordination required Donald Irish, one of the two executives of MSC to visit regularly each of the four subcontractors, on an every-day or every-other-day basis.[8]

In addition to these coordinating responsibilities, which are to varying degrees inherent in any subcontracting system, MSC also undertook the function of itself providing the subcontractors with some raw materials and necessary financing. During FY 68 and FY 69, MSC supplied one subcontractor with the steel it needed. The specification for the low carbon steel utilized for the ring production was a very common one, however, and MSC was able to place orders for the steel by merely referring to this specification. Neither MSC nor any of its subcontractors encountered any problems during the review years in obtaining this steel, and MSC was able to minimize the risk in prepurchasing by keeping the steel in its readily marketable coils until needed for a specific order. MSC also aided its metal plating subcontractor by advancing it $10,000 to finance the purchase of an automatic plating line necessary for meeting the increased Government demand. During the review periods, MSC provided all of its manufacturing subcontractors with financing to build the metal forming dies necessary for the manufacture of both the 18-gauge and 14-gauge rings, and additionally provided one of these subcontractors with the funds required to maintain those dies.

In order to supply PIP with the completed rings, MSC itself performed the crimping operation necessary to form the combination ring from the parts provided by the subcontractors. MSC's initial crimping operation required an employee to hand assemble an 18-gauge curled ring and a 14-gauge flat ring by placing the former within the upraised tabs of the latter, to insert the assembled combination ring into a press by using a pair of pliers, then to operate the press, and finally to remove the completed combination ring from the press and deposit it in a storage container. Utilizing this process, MSC was able to produce approximately 4,000 combination rings per press during each 8-hour shift. Subsequently, in order to speed up production, MSC began to use a slide technique in performing the crimping operation. Under this method, which was suggested by an employee of one of MSC's subcontractors and was used for most of MSC's production during the review periods, an employee assembled the 18-gauge curled ring and the 14-gauge flat ring, and placed them on a slide leading into a press. Once the assembled rings slid into the press, the employee operated the press, thereby crimping the rings together, and the press then automatically rejected the completed combination ring into a storage container. This technique expedited production and eliminated the prior requirement that hand-assembled rings be manually placed into the press with a pair of pliers for permanent assembly. Using the slide production method, MSC was able to increase its production to as many as 20,000 or 21,000 combination rings per press dur-

had been subcontracted. In FY 68, this rose to 90% and reached 91% in FY 69.

8. Because each subcontractor maintained its own inspection department, MSC was able to inspect the rings produced by these subcontractors on a random basis.

ing each 8-hour shift.[9] MSC's crimping operation was thus a simple, repetitive, and mechanical one, for the operation was entirely automatic once an employee physically placed an 18-gauge curled ring within the upraised tabs of a 14-gauge flat ring, and then placed the resulting combination ring onto the slide. The press, which contained the appropriate tooling, did the rest. The first step in the operation—i. e., the hand-assembly of the two rings—required some care and alertness on the part of MSC's production workers, since an incorrect assembly of the two rings would result in a defective combination ring. Nevertheless MSC was able to use unskilled labor in its operations.

When MSC finished its crimping operation, the combination rings were delivered to PIP which then covered them with an asphalt-asbestos compound. The completed product was ultimately used by the Government (or its agents) in packing 105mm howitzer ammunition, which was the main artillery weapon used by our forces in the Vietnam conflict. In 1970, an unanticipated change in the requirements of NATO ammunition standards made the encapsulated combination ring obsolete, and MSC chose to discontinue operations at that time.

During its peak production in the review years, MSC managed to produce more than 43 million combination rings for PIP and was never delinquent in making a scheduled delivery. Only a negligible number of its rings were rejected for failure to meet Government requirements. And as the volume of production greatly increased during this period, the cost of production fell. In FY 1967, the cost of producing the ring averaged 11.7 cents per ring, with an average administrative cost of .6 cents per ring, making a total average cost of 12.3 cents. In FY 1968, the cost of production fell to 10.2 cents while the administrative cost also fell to .4 cents, for a total average cost of

10.6 cents. By FY 1969, the production costs fell even further to 9.2 cents, while the administrative costs remained the same, for a total average cost of 9.6 cents. These reductions in cost were gradually reflected in the prices MSC charged PIP. The average price charged by MSC was 15.3 cents per ring during FY 67, 13.3 cents during FY 68, and 11.5 cents during FY 69. Stated in terms of actual review year performance, MSC produced 11,759,196 rings in FY 67, and earned a profit of $303,624, or 2.58 cents per ring; on a volume of 10,486,400 rings supplied to PIP in FY 68, MSC's profit was $278,130 or 2.65 cents per ring; and from its production of 21,414,000 rings in FY 69, MSC earned a profit of $399,053 or 1.86 cents per ring.[10]

In setting the prices leading to this level of profitability, MSC's procedure was to estimate the per unit cost and then add what Foster Irish considered to be a "reasonable amount" to cover general and administrative expenses and provide a profit. MSC always accepted the initial per-unit price proposed by one of its subcontractors in its purchase orders from that subcontractor. Whenever MSC proposed a per-unit price to PIP for a quantity of rings in a particular purchase order, its initial price was also invariably accepted by PIP. PIP made three attempts to locate other sources for its combination rings, and even placed one order with an outside firm, but felt MSC's performance was preferable to that obtainable from those companies.

II

It is necessary to consider first the Government's contention that plaintiff has not made out its required prima facie case, for if this be true the failure would be conclusive against plaintiff and would result in at least an affirmance of the Board's

---

9. Unlike its procedure for developing a suitable die and for selecting its subcontractors, MSC did not rely solely upon local sources to obtain the inclinable presses necessary for its slide production method, but instead purchased the necessary machines in Chicago.

10. Neither party questions the difference in profit per ring reflected in these two sets of numbers (i. e., the individual cost-price set as compared to the total profit-total sales set).

unilateral order.[11] Defendant characterizes our prior decisions as requiring the contractor to prove only that it has earned a profit (*i. e.*, prove its book entries)[12] and advocates that this burden should be changed to require the contractor to address the question of the excessiveness of its profit and the amount thereof.

Defendant's contention, however, is based upon a misunderstanding of our prior decisions and upon a mischaracterization of the trial judge's application of those decisions to the facts of this case. In *Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 1401, 198 Ct.Cl. 312, 326–27 (1972), we indicated that the contractor

> has the initial burden of going forward with proof as to the statutory factors upon which it relies to the extent that the facts pertaining thereto are within its knowledge or possession, are accessible to the public generally in the form of published reports, or are *actually made available to the contractor* by the Government, voluntarily through a request made in pre-trial proceedings, by discovery under the rules of the court, or pursuant to the Freedom of Information Act . . . Normally, when the contractor does this, it will have made a prima facie case, i. e.,

a showing which, unless rebutted, would justify a judgment in accord with the contractor's contentions. (emphasis in original).

The contractor thus has something similar to a burden of production[13] as to those statutory factors upon which it relies, but that burden is limited and defined by the extent of readily accessible information.[14] Indeed we have described the contractor's burden of going forward as the requirement that the contractor "show that it had acted responsibly in invoking the processes of the court, and not just for purposes of delay," *Instrument Systems Corp. v. United States*, 546 F.2d 357, 362, 212 Ct.Cl. 99, 108 (1976), and have stated that its function is "largely to safeguard [the Government] against being surprised," *Butkin Precision Mfg. Corp. v. United States*, 544 F.2d 499, 511, 211 Ct.Cl. 110, 131 (1976).[15] Thus we have held that the contractor's prima facie case does not demand expert testimony, *id.* 544 F.2d at 510, 211 Ct.Cl. at 130; nor does it require comparisons with other contractors, at least not with data not readily available under the Freedom of Information Act, *Dynasciences Corp. v. United States*, 214 Ct.Cl. ——, ——, slip op. at 11

---

11. Because we find that plaintiff has met its prima facie burden, we need not now decide whether failure to establish a prima facie case would result in an adoption of the Renegotiation Board's decision, as occurs when the contractor fails to prosecute a Board order, *Harvard Industries, Inc. v. United States*, 521 F.2d 1405, Ct.Cl. No. 461–73. Order of May 1, 1975, or whether the failure could result in an award in an amount equal to the Government's counterclaim (if that is sufficiently supported).

12. If, by referring to proof of profits earned, the Government is referring to the contractor's burden of showing the accuracy of its accounting data, we have little trouble with the Government's assertion that more should be required. Normally, accounting data accuracy is a separate part of the contractor's opening case, and since it is not here in dispute, we need not consider it. *See Lykes Bros. S. S. Co. v. United States*, 459 F.2d 1393, 1401, 198 Ct.Cl. 312, 326 (1972); *Camel Mfg. Co. v. United States*, 572 F.2d 280, 215 Ct.Cl. —— (1978).

13. That is, the duty to produce evidence which would justify a reasonable jury in finding the existence or non-existence of the fact so that a judicial ruling for the other party may be avoided. McNaughton, *Burden of Production of Evidence: A Function of a Burden of Persuasion*, 68 Harv.L.Rev. 1382, 1383 (1955); *see* 9 J. Wigmore, Evidence § 2487 (3d ed. 1940).

14. We have so confined the contractor's burden that we have even restricted contractors, in attempting to establish their prima facie case, from obtaining information which is not readily accessible. *Instrument Systems Corp. v. United States*, 546 F.2d 357, 362, 212 Ct.Cl. 99, 108–09 (1976).

15. We have also referred to the contractor's burden in renegotiation as requiring merely "a modest showing of probable cause" as to the responsible invocation of the court's processes. *Instrument Systems Corp. v. United States*, 546 F.2d at 362, 212 Ct.Cl. at 108.

(July 8, 1977); *Instrument Systems Corp. v. United States*, 546 F.2d at 362, 212 Ct.Cl. at 108–09. It is not surprising that in no case to date has the court held that a contractor has failed to meet its prima facie case.[16] In *Gibraltar Mfg. Co. v. United States*, 546 F.2d 386, 388, 212 Ct.Cl. 226, 228 (1976), for example, the contractor was found to have earned excessive profits largely because it had "not demonstrated its right to factor adjustment of [sufficient] magnitude." That decision was not based on the failure of the contractor to meet its prima facie case, making unnecessary the Government's putting in of its case; rather, the plaintiff's evidence was so inadequate that the Government was able to carry its burden of proof, *id.*

■ These low-level requirements for the prima facie case do not mean that the contractor has little reason to present its most compelling evidence as part of that burden; such evidence will influence the outcome of the case by determining how easily the Government can meet its burden of persuasion. *Aero Spacelines, Inc. v. United States*, 530 F.2d 324, 332–33, 208 Ct.Cl. 704, 716–17 (1976); 9 J. Wigmore, Evidence, §§ 2485, 2487 (3d ed. 1940). When the contractor fails to include sufficient accessible evidence important to a statutory subfactor, the result can be that the court will not even consider that subfactor. *Aero Spacelines, Inc. v. United States*, 530 F.2d at 344, 208 Ct.Cl. at 736; on the other hand, failure of the Government to include certain evidence leaves the Government to meet its burden with other proof, *Page-River-Curran v. United States*, 574 F.2d 1063 (Ct.Cl.1978), and that burden can, of course, be more easily met when the plaintiff's proofs are inadequate.

■ Under these standards, there is sufficient evidence in this record for the court to conclude that the contractor has met its prima facie burden.[17] Defendant has conceded that MSC merits some recognition for its efficiency; the evidence of MSC's ability to reduce its costs and prices, *Aero Spacelines, Inc. v. United States*, 530 F.2d at 349–50, 208 Ct.Cl. at 746–47, and the proof of high quality production on schedule in very great quantities, *Major Coat Co. v. United States*, 543 F.2d 97, 116–17, 211 Ct.Cl. 1, 34–36, are sufficient for plaintiff to carry its initial burden for efficiency under *Lykes Bros., id.*, 543 F.2d at 123, 211 Ct.Cl. at 47. Similarly, the risk of obsolescence, the uncertainty as to its ability to invent an appropriate die for an uncertain future demand, and its operation under formal fixed price contracts are sufficient to meet its prima facie burden for the risk factor, *Aero Spacelines, Inc. v. United States*, 530 F.2d at 346, 349, 208 Ct.Cl. at 740, 745, 746. Also, MSC's willingness to design and build the dies capable of mass-producing the 18-gauge ring at its own expense and risk is a sufficient factor in its initial burden under the character of business factor, *id.*, 530 F.2d at 341–42, 208 Ct.Cl. at 732. Furthermore, its technological development of a slide for feeding its presses and of a die capable of mass-producing the 18-gauge ring meet prima facie standards for favorable consideration for contribution to the defense effort. And MSC's ability to reduce its costs and the prices of its product could entitle it to favorable consideration under "Reasonableness of Cost and Profits." While this recitation of facts supporting the sufficiency of MSC's prima facie case is not meant to be inclusive, it certainly meets the requirements of prior decisions of this court. *Cf.*

16. We have even permitted the contractor to use evidence introduced by the defendant in the latter's effort to meet its burden of persuasion as part of the contractor's prima facie case if the defendant does not move to dismiss at the close of the contractor's case. *Dynasciences Corp. v. United States*, 214 Ct.Cl. ——, ——, slip op. at 11 (July 8, 1977).

17. Defendant has not identified any elements in the record which were not in the plaintiff's initial presentation (and which were therefore not introduced prior to the motion for dismissal), but rather were presented as evidence introduced by defendant to meet its burden of persuasion, *see* note 16, *supra*. We shall therefore assume that the facts favorable to MSC were part of plaintiff's prima facie case.

Page-River-Curran v. United States, 574 F.2d 1063 (Ct.Cl.1978) (prima facie case met by establishment of costs and profits, proof that project was important, novel and complex, that project was performed with efficiency and under some risks, and that it constituted valuable contribution to defense effort); Butkin Precision Mfg. Corp. v. United States, 544 F.2d at 510, 211 Ct.Cl. at 130 (prima facie case satisfied by "mass of business records and financial exhibits, plus testimony of Mr. Butkin and others, tending to support its claim to favorable consideration under several statutory factors.") See Instrument Systems Corp. v. United States, 546 F.2d at 362, 212 Ct.Cl. at 108–09; Dynasciences Corp. v. United States, 214 Ct.Cl. ——, slip op. at 11 (July 8, 1977); Aero Spacelines, Inc. v. United States, 530 F.2d at 332, 342, 346, 349, 350, 357, 208 Ct.Cl. at 715, 732, 740, 745, 746, 758–59. Whether MSC's initial case would have to be stronger in order to survive defendant's case on the issue of ultimate persuasion is a different question, to which we now turn.

### III

 Particularly troublesome in determining whether the defendant has carried its burden of persuasion is the failure of either party to present meaningful comparative data. As the following table shows, plaintiff's review years were quite unique when compared with its immediately preceding years.

| | Production Volume | Sales | Profits | Profits per ring | Profit-Sales Ratio | Renegotiation Board Action |
|---|---|---|---|---|---|---|
| FY 65 | 9,600 | $ 32,353 | $ 2,841 | 29.6c | 8.8% | below statutory minimum |
| FY 66 | 611,777 | 272,051 | 65,382 | 10.7c | 24 0 | below statutory minimum |
| FY 67 | 11,759,196 | 1,798,179 | 303,624 | 2 58c | 16 9 | $110,699 |
| FY 68 | 10,486,400 | 1,395,918 | 278,130 | 2 65c | 19 9 | 145,862 |
| FY 69 | 21,414,000 | 2,461,469 | 399,053 | 1 86c | 16.2 | 161,718 |

Yet the parties have stipulated that comparisons with MSC's pre-review years are not appropriate for purposes of determining if plaintiff's renegotiable profits were excessive.[18] MSC's discontinuance of operations shortly after the review period precludes comparisons with its post-review year profits, see Butkin Precision Mfg. Corp. v. United States, 544 F.2d at 508–09, 211 Ct.Cl. at 127 and MSC's failure to produce anything but metal supports for defense ammunition precludes comparison of the profitability of defense and commercial products.

Defendant's proofs did not totally avoid making comparisons, for it did attempt to compare MSC with its alleged industry. These comparisons were with the average profit levels of firms engaged in the metal stamping industry as published in the Internal Revenue Service's Corporation Source Book of Statistics of Income. This data is classified by total assets, and defendant sought to compare MSC with the averages of firms with similar sales volumes, net worth and capital employed. Comparison of MSC's profits with those of the metal

18. Defendant now seeks to be relieved of this stipulation, arguing that a party may be relieved of a stipulation if necessary to prevent injustice, and that this stipulation is without effect since it is beyond the power of the parties to stipulate. But defendant has not identified how it will suffer an injustice; to the extent it argues that our decisions prior to Major Coat failed to provide guidance sufficient for defendant to appreciate fairly the significance of its stipulation, we reject such a claim, for the central importance of some comparative data to renegotiation was recognized prior to the trial of this case. Mason & Hanger-Silas Mason Co. v. United States, 518 F.2d 1341, 1359–61, 207 Ct.Cl. 106, 137–40 (1975); Aero Spacelines, Inc. v. United States, 530 F.2d at 340, 208 Ct.Cl. at 729. The factual nature of this stipulation was also within the power of the parties to stipulate, and defendant has failed to show any "special considerations" entitling it to be relieved of that stipulation. Aero Spacelines, Inc. v. United States, 530 F.2d at 334, 208 Ct.Cl. at 719.

Even were we to relieve defendant of this stipulation, however, it would not help defendant's case greatly, for it asserts that only 1965 is a proper historical norm. MSC has been in existence since 1956, and we would require more evidence as to the appropriateness of any time period selected as a base period before giving it great weight, especially when one so short is advocated. See Mills Mfg. Corp. v. United States, 571 F.2d 1162, 1169–72, 1179, 215 Ct.Cl. ——, slip op. at 11 (1978).

stamping industry with respect to sales yielded these results:

MSC and Industry Profit/Sales Comparisons

| | Profits | | Annual Rate | |
|---|---|---|---|---|
| | MSC | Industry | MSC | Industry |
| FY 67 | $303,624 | $97,425 | 16 9% | 6.3% |
| FY 68 | 278,130 | 44,167 | 19 9% | 7.0% |
| FY 69 | 399,053 | 150,149 | 16 2% | 6.1% |

However, discounting of the use of IRS composite averages in renegotiation proceedings is now of long standing. *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d at 504, 211 Ct.Cl. at 118–19; *Gilbraltor Mfg. Co. v. United States,* 546 F.2d at 388, 212 Ct.Cl. at 229; *Instrument Systems Corp. v. United States,* 546 F.2d at 361, 212 Ct.Cl. at 107. Here, our disappointment in these figures is again well-founded for the firms within this SIC classification are only required to derive 51% of their business from metal stamping operations, and thus these industrial averages may in reality include companies that substantially manufacture quite dissimilar products. Similarly, these averages are totally devoid of evidence indicating what kinds of metal stamping operations are performed by firms included in the averages; nor is the character, efficiency and risks of these firms (relative to plaintiff's) indicated in any meaningful way, *Major Coat Co. v. United States,* 543 F.2d at 115, 211 Ct.Cl. at 32. More particularly, we note that defendant's expert subtracted MSC's outside investments in determining its total assets for comparison with these industry averages. We do not know whether the firms composing the IRS averages did this as well, or how inclusion of MSC's outside investments

would have affected the ratios. Furthermore we note that the comparisons with industry averages were apparently made on the basis of the averages of firms with similar total assets. "Total assets" as a selection criterion for firms composing the average may be misleading for "total assets" is not reflective of a company's net worth, which deals with net assets, and is usually distinct from the company's capital employed and level of sales. Our suspicion that these averages may in reality be based on companies with different sales volumes, net worth and capital employed is heightened by our inability to extrapolate from these tables any similarity in levels of total sales, profits and net worth, even when we convert the profits, sales, net worth or capital of either set of figures to either an annual or a fiscal-year basis. Additionally we note that defendant originally proposed profit-sales ratios for MSC in FY 67 and FY 68 far in excess of the actual ratios, and we are given no reason for this discrepancy.[19] Finally we note that each of defendant's three tables (two are not shown here) state industry profit averages which are markedly different from the other two tables (MSC's profit levels, however, remain constant in each table). Whether this difference is due to the difference in industry samplings in each table or to a separate analytical error we cannot tell, but we note that our traditional reluctance to consider such averages as controlling seems here to be solidly grounded.[20]

19. Defendant's expert asserted that MSC's profit-sales ratio was 19.7% in FY 67 and 44.0% in FY 68 instead of the 16.9% and 19.9% found respectively by the trial judge. No error in the trial judge's calculations has been shown to us by defendant.

20. Our reluctance to use this data does not mean such data is never acceptable at all, for we have often recognized that the vital need for comparative data in renegotiation means that we should completely disregard such data only for the most compelling reasons. *Major Coat Co. v. United States,* 543 F.2d 97, 121–22, 211 Ct.Cl. 1, 44 (1976). *See Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d 1341, 1363, 207 Ct.Cl. 106, 143–44; *Aero Spacelines, Inc. v. United States,* 530 F.2d 324, 340, 351 n. 26, 208 Ct.Cl. 704, 729–30, 748 n.

26. We have never held such data to be irrelevant per se, *Major Coat Co. v. United States,* 543 F.2d at 114, 211 Ct.Cl. at 30, and have even indicated a willingness to use such data to confirm a decision reached on other grounds, *Page-River-Curran v. United States,* 574 F.2d 1063 (Ct.Cl.1978), and to form the lower end of the industry profit spectrum, at least if composed of firms already renegotiated, *Major Coat Co. v. United States,* 543 F.2d at 122, 211 Ct.Cl. at 44. Given our willingness to use this type of data in this limited sense, we question the trial judge's refusal to at least consider using this data as the most strongly discounted of starting points, at least when the alternative is to issue a clearance. *Cf. Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1169 n. 5, 215 Ct.Cl. ——, at —— n. 5 (1978) (Defendant's error

■ There exists an independent reason, moreover, for refusing to consider as decisive the Government's comparisons of MSC's profit-net worth and profit-capital employed ratios with those derived from IRS industry averages. Since MSC relied extensively on subcontractors in manufacturing the inserts, it was not a capital intensive business. Indeed, between 78 and 91 per cent of its cost of sales were for materials and work that had been subcontracted, and its fixed assets never exceeded $32,368 and dropped below $20,000 at the end of the review period. MSC's returns on net worth and capital employed are not appropriate measures for determining the reasonableness of its profits. *A. C. Ball Co. v. United States,* 531 F.2d 993, 1011, 209 Ct.Cl. 223, 256 (1976); *cf. Dyanasciences Corp. v. United States,* 214 Ct.Cl. ——, slip op. at 18–19 (July 8, 1977) (court endorsed parties' agreement that non-capital intensive nature of business made return on net worth not a relevant measure of reasonableness of contractor's profits).[21]

## IV

Defendant's failure to provide us with meaningful comparative data is not fatal to its case, for it "simply leaves the Government to meet its burden, if it can, with other proof." *Page-River-Curran v. United States,* 574 F.2d 1063 (Ct.Cl.1978). Defendant also benefits from our previous indication that, in early trials such as this one, we will not rigidly hold the defendant to the standards of proof called for by *Lykes Bros. Mills Mfg. Corp. v. United States,* 571 F.2d 1162, 1180 n.23, 215 Ct.Cl. ——, at —— n.23 (1978); *Dynasciences Corp. v. United States,* 214 Ct.Cl. ——, slip op. at 2 (July 8, 1977). Furthermore, we have reviewed the rest of defendant's evidence with deference to the flexibility of approach to renegotiation which has formed the very purpose of the statutory system, *Mason & Hanger-Si-*

las Mason Co. v. United States, 518 F.2d at 1346, 207 Ct.Cl. at 117; *A. C. Ball Co. v. United States,* 531 F.2d at 1015–16, 209 Ct.Cl. at 263, and with recognition that there comes a point where it is possible to determine the existence of excessive profits without comparative information.

■ The remaining evidence indicates that MSC's vast production volume during the review years was directly related to the Government's urgent need for artillery ammunition in support of our involvement in Vietnam. The very premise of statutory renegotiation is that "accurate pricing and the control of contractors' profits cannot be achieved during a build-up of production for defense of war." *Mason & Hanger-Silas Mason Co. v. United States,* 518 F.2d at 1346–47, 207 Ct.Cl. at 115. The predominant interest of procurement officials in volume of purchases, the requirement of unprecedented speed and the vastly increased demand create a situation where the opportunities for military suppliers to make exorbitant profits are greatly enhanced. Similarly, the knowledge that the peak wartime demand is of short duration itself operates to remove normal competitive restraints on profits. *Major Coat Co. v. United States,* 543 F.2d at 110, 211 Ct.Cl. at 23. Even when contractors reduce their prices to the Government, Congress still remained suspicious of wartime profit levels because "experience in several wars has shown the tendency for unit prices not to decline as fast as the volume increase would justify." *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d at 505, 211 Ct.Cl. at 121.

■ Viewed from this perspective, it is hard to say that MSC did not realize some excessive profits during the review years. Its profit-sales ratio for FY 1967 was 16.9%, 19.9% for FY 1968, and 16.2% for FY 1969. These are not skimpy percentages. It was

---

in failing to claim excessive profits for each review year held to be error not of magnitude warranting clearance).

**21.** Although the sparseness of the comparative data makes it impossible to be mathematically

precise, we note that the Government's contention as to the amount of excessive profits earned would leave MSC with ratios far in excess of these industry averages, though the rationale for this result is not explained.

able to increase its net worth from $76,847 in FY 67 to $253,787 in FY 69, and increased it so much in each review year that defendant's expert had to average the beginning and ending capital and net worth levels, *Aero Spacelines, Inc. v. United States,* 530 F.2d at 350, 208 Ct.Cl. at 747, MSC's total assets also increased from $111,395 in FY 67 to $470,044 in FY 69. There was also a vast increase over pre-review year levels, an increase so great that even defendant's expert found these years to be of little comparative value. In addition, MSC's profits were so great that it was able to invest $100,000 in outside investments. *See Mills Mfg. Corp. v. United States,* 571 F.2d at 1176–77, 215 Ct.Cl. ——, at —— —— (1978). The magnitude of the changes in its net worth and total assets during the review years plus its ability to invest large sums in unrelated business reinforce our belief that some of plaintiff's profits arose from wartime conditions, and not from factors for which MSC was responsible. *See Mills Mfg. Corp. v. United States,* 571 F.2d at 1177, 215 Ct.Cl. at —— (Feb. 22, 1978).

■ That increased wartime demand created a situation where MSC received some excessive profits is also supported by the manner in which MSC set its prices to PIP. Even though as much as 91% of MSC's costs of goods sold was the result of the prices charged by its subcontractors, MSC never challenged the prices these subcontractors requested nor apparently did it shop for the least expensive subcontractor. The very speed demanded by the Government's requirements, which precluded MSC from expanding its own physical facilities, may very well have required MSC to be less than "competitive" in seeking the lowest possible price for its inputs. These demands may also explain why these subcontracts were not awarded on the basis of competitive bids, and why only local (indeed, every local) stamping and plating firm was used. MSC's acceptance of its subcontractor's prices is more significant because its prices to PIP were also never questioned. Its sales to PIP were never the result of orders awarded on competitive bids, and its method of setting its prices was conducive to generous returns. Plaintiff set these unquestioned prices by adding to its estimated costs a figure considered reasonable to cover general and administrative expenses and to provide for profits. The actual pricing experience of MSC indicates how inaccurate this pricing procedure could be, for the price of a single order would often decrease as execution progressed. It seems probable that MSC's approximations would err on the side of securing a profit,[22] and its price reductions through performance indicate its ability to recover a profit at levels far below those originally felt necessary.[23] *Cf. Mills Mfg. Corp. v. United States,* 571 F.2d at 1169, 215 Ct.Cl. ——, at —— (1978) (acceptance of set aside awards itself evidence that contractor thought itself capable of making profit at lower prices, further indicating lack of competition in relevant market). These pricing adjustments are themselves indicative of the lack of closeness of pricing which would be favorable to plaintiff, *see Aero Spacelines, Inc. v. United States,* 530 F.2d at 354, 208 Ct.Cl. at 753, and may well explain why MSC never attempted to secure additional customers. In short, the pricing structure, as between the subcontractors and MSC, and between MSC and PIP, is not indicative of the close scrutiny of costs normally found in a competitive market, but rather is in keeping with conditions prevalent in wartime procurement.[24]

The record thus shows, in our view, that it is entirely proper to start in this case with the initial premise that wartime de-

---

**22.** Mr. Irish testified that its prices, initially at least, were so set. (Record at 82)

**23.** Indeed the order of Sept. 9, 1968 decreased almost 16%, from its initial price of $.1225 per ring to $.1031, during performance.

**24.** In addition, it is possible that the unique interplay of personalities in the development of PIP and MSC may have provided some incentive for less than precise scrutiny of prices; at least in a wartime economy, this factor may have had greater play than would be true in a closely competitive market.

mands and the special circumstances of wartime procurement—all of which Congress had primarily in mind when it enacted the Renegotiation Act—probably formed the basis for the company's rather high level of profits during the review years.

## V

In spite of the inherent dangers in wartime procurement and in MSC's pricing arrangements during that period, the plaintiff might deserve a clearance if its increases in net worth, total assets and profits were due to an increase in efficiency (or other factors negating the existence of war-inflated profits). The company claims responsibility for two technological innovations which it says justify its profit levels during the review years—the slide mechanism feeding assembled rings into the press, and the development of a die capable of satisfactorily curling the 18-gauge ring in mass. The adoption of the slide mechanism, first suggested by one of MSC's subcontractors, is the kind of normal improvement expected from a competent contractor, and warrants little credit under efficiency. *Page-River-Curran v. United States,* 574 F.2d 1063 (Ct.Cl.1978) (contractor's suggestions and improvements, involving more complex repairs and modifications than here, not reimbursed since such was expected from competent and experienced contractors). Similarly, we are not convinced that MSC's development of a die capable of mass producing the 18-gauge ring was such a technological breakthrough as to warrant great recognition. At no time did plaintiff ever attempt to utilize the services of experienced die-makers in adjacent large cities, but instead relied solely on local machine shops. One of plaintiff's reasons for failing to use more distant, larger shops was fear that such companies would copy the process and become major compet-

itors if and when a future demand arose. This seems to be a spurious rationale; plaintiff would have more likely feared a local shop stealing its "innovation"—such a shop would be more likely to compete directly for PIP's business. Certainly a local competitor would not be disadvantaged by higher transportation costs and would also be as convenient to PIP as was MSC. Plaintiff's alternative reason for failing to use better resources was its feeling that the then-existing low demand for the ring did not warrant such efforts. MSC's efforts between 1962 and the early part of 1966, consisting of the on-and-off efforts of its principals (both of whom lacked a background in engineering, die making or die designing), thus seem closer to calculated business entrepreneurship than to development of an innovative process that could greatly affect MSC's efficiency. When MSC had an immediate need for an item, as it did when it sought inclinable presses, it proved itself willing to utilize the resources of the larger cities. In any event, once MSC was given word that the combination ring was about to be utilized, it turned again to local sources who were able to develop the suitable die in a matter of months. Plaintiff has failed to show development of this die was the result of its earlier efforts.[25] Indeed the record seems to view the development of the progressive die as being the key to the technological innovation; yet MSC's only claimed contribution to its development was the concept of cutting out an hourglass figure in the metal as it passed through the die. When added to the fact that defendant's expert needed only seven to eight weeks to develop a suitable die in 1968 for a MSC competitor, and indeed needed only a few hours to develop the most "innovative" part of that die,[26] our belief that development of this die

---

**25.** Plaintiff's claims as to the merits of its innovation are also blunted by the fact that other firms producing the metal combination ring did not appear to have any difficulty in mass producing the ring. *Cf. Page-River-Curran v. United States,* 574 F.2d 1063 (Ct.Cl.1978) (other contractors' ability to furnish working commu-

nications system on time muted plaintiff's claims for technological breakthrough).

**26.** MSC asserts that little weight can be given to this expert's efforts since they occurred almost two years after its "innovation." Yet we do not believe development of this die was such a breakthrough that defendant's efforts two

was not the kind of technological breakthrough permitting the contractor to be so much more efficient that it now deserves a clearance, seems well founded.[27] *See Mills Mfg. Corp. v. United States,* 571 F.2d at 1176, 215 Ct.Cl. ——, at —— (1978).

Nevertheless, MSC's ability to increase its volume to over 43 million parts in 29 months while still maintaining high quality and timeliness in its deliveries is worthy of some favorable recognition under efficiency, at least in the absence of comparative information. *See Major Coat Co. v. United States,* 543 F.2d at 116, 211 Ct.Cl. at 34–35. Defendant has conceded that MSC merits some favorable consideration for its efficiency.

Although MSC's ability to produce this expanded volume of rings through utilization of its die was largely due to its decision to subcontract the necessary production of component parts, that decision also operated to reduce the risks MSC faced during this period by permitting it to avoid risking its own capital; as such, MSC cannot be allowed as large a profit as would otherwise be the case. 32 C.F.R. § 1460.-14(b)(3)(i) (1977); *Aero Spacelines, Inc. v. United States,* 530 F.2d at 352, 208 Ct.Cl. at 749. Similarly, the risks MSC faced through its responsibilities for coordinating its subcontractors' operations seem typical of those inherent in any subcontracting system; these risks were certainly not of the magnitude found in *A. C. Ball Co. v. United States,* 531 F.2d at 1001–03, 209 Ct.Cl. at 238–41, where, unlike here, the contractor employed a vast complex of subcontractors located throughout the United States involving technologically complex components in several interdependent markets; here, the risks of subcontracting are found deserving of but minor recognition. Furthermore, although plaintiff operated under

formal fixed price contracts, and thus assumed some risks inherent in that type of contract, *A. C. Ball Co. v. United States,* 531 F.2d at 1007, 209 Ct.Cl. at 248–49, those risks do not seem great enough in this instance to warrant much favorable consideration. The relatively short term nature of the contracts (there were at least eleven of such orders over a thirty month period) gave plaintiff greater ability to compensate for any cost increases that could have occurred, and its method of calculating the price of its product, as well as its ability to change its price as performance under a purchase order progressed, evidence less than the normal risk incident to fixed price contracting. Plaintiff did, however, face greater risks than do most contractors from Government terminations for its convenience and from obsolescence of its product because it was a single product defense manufacturer of a relatively simple product; yet, this concession to plaintiff must be weighed against the knowledge that the artillery shell, of which MSC's product was a part, was the primary shell used by defendant in Vietnam. *Cf. Aero Spacelines, Inc. v. United States,* 530 F.2d at 346, 208 Ct.Cl. at 739 (option of NASA to not renew contract found to be little risk because of NASA's commitment to place man on moon by 1970). Finally, we feel MSC's financing of its subcontractors deserves some, although limited, recognition.

MSC likewise deserves some favorable recognition for its voluntary reduction of the prices it charged during the review years. 32 C.F.R. § 1460.12(b)(2)(1977). Of course, the mere fact that MSC reduced its prices, even if they were reduced to levels lower than its competitors, does not establish that its profits were reasonable. *Mills Mfg. Corp. v. United States,* 571 F.2d at

---

years later necessarily built upon that invention, and plaintiff has failed to otherwise specify to our satisfaction why the expert's efforts are not highly probative.

27. What we have said about both technological changes also refutes MSC's claims for considerable favorable recognition for contribution to the defense effort. These changes were cer-

tainly not the product of so much inventive or risk-taking effort as to qualify plaintiff for a reward for exceptional performance, experimental work, or development of techniques of unusual merit. *Major Coat Co. v. United States,* 543 F.2d at 120, 211 Ct.Cl. at 41; 32 C.F.R. § 1460.13(b) (1977).

1168, 215 Ct.Cl. ——, at —— – —— (1978); *Gibraltor Mfg. Co. v. United States,* 546 F.2d at 393–94, 212 Ct.Cl. at 239. Nevertheless, based upon average costs and average profits over the review years, MSC reduced its costs by 22%, but reduced its prices to PIP by 25%. Although superficially persuasive at first glance, these percentages, based upon averages, do not reflect the timing of these price reductions. As experience has shown greater price reductions may have been due at earlier times, *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d at 505, 211 Ct.Cl. 121, and, if so, MSC would have earned excessive profits. Although MSC's first order was priced at 15 cents per ring and its last order was filled at 10.3 cents per ring, over half of MSC's review year production was sold within a total price differential of three-quarters of one cent. Use of average costs and profits in these circumstances may thus be misleading. Furthermore the dramatic price reduction would be overstated if MSC's initial price was high, and MSC's principal, Mr. Irish, has stated that his initial prices were "a little on the high side." Finally, since we have discounted the value of MSC's "innovations," it is hard for us to see what, besides economies of scale resulting from the Government's increased wartime demand, can substantially explain MSC's ability to reduce its prices, and we are not convinced that MSC's reductions in prices fully reflect the Government's entitlement to the benefits resulting from that increased demand. 32 C.F.R. § 1460.-10(b)(2) (1977); *Butkin Precision Mfg. Corp. v. United States,* 544 F.2d at 505, 211 Ct.Cl. at 121. Thus, we cannot find that minor favorable consideration for MSC's voluntary price reductions, even in conjunction with its limited favorable recognition under other statutory factors, is sufficient to warrant a clearance.

## VI

■ Without meaningful comparative information,[28] the determination of the amount of MSC's excessive profits must necessarily be far from exact and peculiarly calls for a broad-brush approach. *Mills Mfg. Corp. v. United States,* 571 F.2d at 1180, 215 Ct.Cl. ——, at —— (1978); *A. C. Ball Co. v. United States,* 209 Ct.Cl. at 229–30, 531 F.2d at 996. The Government has persuaded us that the potential for excessive profits from the peak wartime demand and the actual changes in net worth, total assets and profits are simply too great to give MSC a clearance. All things considered, a profit-sales ratio of 16.9% (FY 67), 19.9% (FY 68) and 16.2% (FY 69) is too high for this company for those years. MSC's ability to invest large sums in non-business related areas, its informal pricing methods, and its ability to reduce its prices in the process of filling an order during a wartime buildup all conduce to a belief that some excessive profits were earned. Had MSC been able to convince us that its two technological "innovations" permitted it to be markedly more efficient than other firms or that such inventions constituted an important contribution to the defense effort we might have found its profit levels more acceptable. Had its prices not been initially high and had it proven that its price reductions were timely made in response to cost reductions due to the wartime buildup, it might have deserved a clearance or more favorable treatment. Had its risks seemed larger, and more real, it might have been permitted a larger return. The same is true if its work had not been as simple, non-demanding and routine as it was.

■ Given the relatively minor favorable consideration to which plaintiff is entitled under the statutory factors (including efficiency, character of business, risks, and contribution to defense), and in the absence of any helpful comparative data, we conclude that the best profit-sales ratio to which this plaintiff could be entitled for the review years is 13% (making no distinction

---

**28.** It is fair to say again that, on the whole, defendant escapes the harsh judgment of a clearance—because of failure to provide some sort of meaningful comparative data—because this case was tried prior to the more explicit decisions of this court explaining the need and calling for such comparative information.

among the three years).[29] Defendant has failed, in our opinion, to show that a lower ratio should be set for any of the years.[30] Accordingly, we hold that MSC earned excessive profits of $80,300 in FY 67, $111,104 in FY 68, and $90,876 in FY 69.

NICHOLS, Judge, concurring in the result:

Here is another renegotiation case where the court has undertaken to make bricks without straw.

In floating, as we did, in *Lykes Bros. Steamship Co. v. United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972), the idea that besides proving its financial data, the petitioner must make a prima facie case on factor analysis, we supposed, I believe, that the great prime defense contractors would be before us. Our new procedures were meant to make things easier for petitioners, but also had the unwanted effect of making the litigation slower and more costly. The idea that the majority of our litigants, allegedly swollen with excessive profits, would be little companies, as here, at the sub- or sub- sub-contract level, often impoverished to the degree of being unable to obtain a bond to stay collection of the refund ordered by the Board, was mercifully unknown to the court. As the cases revealed themselves, the defendant has repeatedly demanded dismissal for failure to make a prima facie case, and panels have as repeatedly declined to do it, as the court points out, with instances. Counsel have failed to make the investigations, and put on the stand the expert witnesses, that *Lykes Bros.* as construed by defendant, would demand. To me, at least, such a rigorous application of the *Lykes Bros.* standard would be to assess a penalty for being small and impecunious. The panel seems to me to intimate skepticism that any petitioner will ever fail the prima facie case test. Here, unlike most previous cases, de-

fendant made a motion to dismiss at the close of plaintiff's case, which was the proper time to do so. *Dynasciences Corp. v. United States,* 214 Ct.Cl. 643 (1977). Probably its grounds for making such a motion were as strong as they will often be, that is, plaintiff offered practically nothing that, even if fully believed, established that the Board refund orders were excessive. Yet defendant somewhat lacks grace in moving to dismiss on such grounds, when its own case is going to suffer from the same defects. After denial of its motion, defendant went ahead, and its own case was just about equally empty. The problem is how to decide when both parties have shown us so little. I have a strong intuition that the clearances proposed by the trial judge would be miscarriages of justice. They would be taken, and justly taken, as indicating a lack of sympathy by the court with the purposes of the Renegotiation Act. To dismiss the petition would inevitably reinstate the decisions of the Board, which appear to me to be harsh and punitive.

We are unaided here by the opinion or opinions of the Board, and therefore are unable to say whether they present even a superficial appearance of being reasonable. We do not know how the Board applied the factors. While such are not available to defendant to help in sustaining its burden of proof, they should be so available to some extent for petitioner. That is to say, it should be able to get the opinions into the record, however impecunious it might be. Once in the record, the opinions should help to make the petitioner's prima facie case. In *Instrument Systems Corp. v. United States,* 546 F.2d 357, 362, 212 Ct.Cl. 99, 109 (1976), we said:

> * * * Plaintiff may accept as correct part of the Board factor analysis, as to some factors, and show that the Board has done injustice with respect to others, thus stressing what the contractor best knows, its own business.

---

**29.** The Board left MSC, in effect, with a profit-sales ratio of 11.4% (FY 67), 10.6% (FY 68) and 10.3% (FY 69). Defendant seeks even lower ratios for each year.

**30.** It may be that there were greater excessive profits in FY 68 and FY 69 when the production was greater (if the time-span is taken into account), but defendant has failed to demonstrate that that was so.

Thus, if the Board said petitioner's business was free from risk, and petitioner in its prima facie case showed a substantial risk, petitioner might be held to have made a prima facie case by tentatively accepting and relying on the Board analysis as to all but one statutory factor, and refuting it as to that one. It is only required to show it has acted responsibly in invoking relief in this court, and a substantial misapprehension by the Board as to even one factor would do it. I deeply regret that so many cases have been allowed to be tried without the Board opinions, useful as they also are for so many other purposes, even though enjoying no presumption of correctness. There has been some sort of strange idea that they cannot even be spoken of without bringing on mistrials. The statute says a "statement" furnished by the Board shall not be used as proof of facts or conclusions stated therein. 50 U.S.C.App. § 1215(a). This does not preclude the party against whom the order is issued from accepting part of them *arguendo*.

I would hope, if our renegotiation pipeline remains full, eventually there will emerge post-*Major Coat Co. v. United States,* 543 F.2d 97, 211 Ct.Cl. 1 (1976) cases, that have been properly tried. When defendant has allowed petitioner to discover what should be discovered, and made the comparable cases it surely knows of also available to help the court, then it will be time to demand that the petitioner show that at least it had a reasonable reason, other than delay, for rejecting Board proposals, taking its unilateral, and suing here. Our *Lykes Bros.* rule was not intended as weasel words, and should not be allowed to become such.

### CONCLUSION OF LAW

The court concludes as a matter of law that for the 1967, 1968 and 1969 fiscal years plaintiff realized excessive profits of $80,300, $111,104 and $90,876 respectively from contracts and subcontracts subject to renegotiation under the Renegotiation Act of 1951, as amended. Judgment is hereby rendered on defendant's counterclaim in the

sum of two-hundred eighty-two thousand, two-hundred and eighty dollars ($282,280), less appropriate state and federal tax credits, plus interest thereon as provided by law.