**EMPIRE BLUE CROSS AND BLUE SHIELD and Blue Cross and Blue Shield Association, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 127–89 C.**

United States Claims Court.

Oct. 14, 1992.

Thaddeus Holt, Washington, D.C., attorney of record for plaintiff.

Terrence S. Hartman, with whom were Director David M. Cohen, Asst. Atty. Gen. Stuart M. Gerson, Dept. of Justice, Washington, D.C., Jeffrey Robbins and Rodney Benson, Dept. of Health and Human Services, Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Blue Cross and Blue Shield Association entered into a contract with the Secretary of Health and Human Services to serve as fiscal intermediary to providers of health care services operating under the Medicare program in New York State.[1] Pursuant to a later-added amendment to this agreement, an experimental, incentive-type subcontract was awarded to Empire Blue Cross and Blue Shield (Empire) to administer that part of the base contract work involving the so-called Medicare Part A program claims.[2]

The issue that brings both of these organizations before us now is the Secretary's decision to disallow approximately $1.3 million of added costs which Empire was paid in connection with the performance of certain authorized changes to its subcontract. The dispute is about whether these reimbursed costs were actually additional costs for which extra compensation was due from the Government. The Government has filed a counterclaim demanding remittance of the amount paid, plus interest.[3]

Both sides have moved for summary judgment. The parties have been given the opportunity to submit written briefs supplemented by oral argument. At the conclusion of the argument (heard August 13, 1992), the court indicated its intention to issue a written opinion in plaintiffs' favor.

## I

Prior to the execution of the subcontract here involved, seven different Blue Cross Plans,[4] including Empire, were acting as Part A subcontract intermediaries in New York State under an umbrella contract between the Secretary and the Association. Recognizing that this was not an efficient arrangement, the Plans initiated a study that resulted in a proposal to centralize this activity in a single facility at Syracuse, New York, to be operated by Empire.

At this same time (1980), the Health Care Financing Administration (HCFA—an arm of the Department of Health and Human Services) was looking with renewed interest at the possibility of using a fixed price contract for the procurement of intermediary services in lieu of the conventional cost-reimbursement, no-fee approach characteristic of the Medicare Program. HCFA was attracted to the Plans' consolidation proposal and simultaneously saw in that proposal an opportunity to test the cost savings potential of a fixed price approach to the procurement of fiscal intermediary services.

With these ends in mind, the parties began negotiations that culminated in the signing, on May 6, 1980, of a Letter of Agreement embodying the principal features of the arrangement. A formal amendment to the existing umbrella contract with the Association, and a detailed

---

1. A fiscal intermediary, usually a private insurance company, serves as the Secretary's agent for the purpose of reviewing and authorizing payment of a health care provider's claims for Medicare-cost reimbursement.

2. The Medicare Part A program, which furnishes hospitalization and related insurance to elderly Americans and certain others, is administered by the Secretary of Health and Human Services under Part A of Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395c to 1395i–3 (1988).

3. Our jurisdiction over this suit derives from the so-called "direct access" provision of the Contract Disputes Act of 1978, 41 U.S.C. § 609(a) (1988). Pursuant to that section of the Act, "a contractor may bring an action directly on the claim in the United States Claims Court." For purposes of this section, "the claim" is understood to include "claims by the government against a contractor relating to a contract." 41 U.S.C. § 605(a).

4. Non-profit organizations that provide hospital and related benefits under the Blue Cross name and symbol are commonly called "Blue Cross Plans."

subcontract executed by HCFA, the Association, and Empire, were to be negotiated subsequently. In essence, the arrangement was that Empire would be the sole Blue Cross Part A intermediary for New York State for a period of three years for a fixed price of $48,903,000. The final negotiations took place in the spring of 1981 and by May 1, 1981 the experimental subcontract was in place.

During the subcontract's initial three-year term there were 23 amendments to the scope of the work, eleven of which involved price increases. The total price adjustment for these eleven changes came to $1,971,085, of which $1,277,575 represented the cost of labor. Each of the change order amendments contained a provision stating that the price adjustment set forth was subject to review and revision by the agency's Inspector General, Office of Audit, based on appropriate findings.

In 1986, as part of a routine examination of Empire's books and records, the Office of Audit undertook a review of the equitable adjustments in contract price that had been incorporated into Empire's subcontract. As a result of this review, the auditors questioned, and recommended disallowance of, the increased labor costs ($1,277,575) previously paid to Empire.

In explanation of the recommended disallowance, the auditors noted in their written report that the criteria for receiving an equitable adjustment in contract price under the subcontract's "Changes" clause was that the "changes increase ... the cost of ... performance." However, such cost increases, the auditors pointed out, had not been established by Empire. To the contrary, based on a review of the subcontractor's staffing levels, Empire was seen as actually having experienced cost decreases. The auditors summarized their findings as follows:

> Our review indicated that $1,277,575 of Empire's claimed costs did not represent cost increases of performance but was merely a reallocation of existing labor resources reimbursed under the original fixed price contract. This was clearly evident in our review of personnel records which showed no performance increases. Instead, we found an overall decrease in Medicare staffing levels during the contract period, May 1, 1981 through April 30, 1984. For example, during December 1981, 337 employees worked on the fixed price contract. However, by December 1983, the number of employees working on the fixed price contract and amendments decreased ... to 302. In effect, Empire's operating costs (labor and fringe benefits) actually *decreased* by over approximately $970,-000 (35 employees) when it claimed $1,971,805, for additional staff to perform contract changes in the scope of work. Therefore, further proving that the tasks purportedly requiring additional staff were unjustified because these tasks were performed with a "decrease" in staffing levels.

The audit report was transmitted to the contracting officer and, on March 30, 1988, the contracting officer issued a final decision adopting the auditors' findings. Empire was advised "that the amount of upward equitable adjustments to the contract price which were made between May 1, 1981 and April 30, 1984, is hereby reduced by $1,277,575." The contracting officer requested Empire's remittance of this amount. Approximately one year later plaintiffs filed this suit challenging the contracting officer's final decision.

II

During the negotiations of the subcontract (after the Letter Contract was executed), the Government requested Empire to provide a "Certificate of Current Cost or Pricing Data" in support of the proposed contract price of $48,903,000. Included in the data thus submitted was a summary of expected administrative costs which listed, among other information, an estimated average manpower requirement of 433 employees to perform the contract work. This information was given to the Government in June 1980.

After award of the contract, and in the course of the audit referred to earlier, examination of Empire's records showed (ac-

cording to the auditor's evaluation of those records) actual staffing levels well below the subcontractor's initial estimate. For the period under study (December 1981 through April 1984), Empire's staffing levels ranged from a December 1981 figure of 337 employees to an April 1984 figure of 302 employees. Thus, not only did Empire's staffing levels never match the initial estimate but, in fact, moved downward over the three-year period during which the added work (the contract changes in issue) was performed.

■ It is this fact—the declining size of Empire's work force—upon which the Government bases its demand for repayment. A compensable change, the Government points out, is defined in the Changes clause as one involving an "increase … [in] the cost of, or the time required for performance of this agreement." But, the Government goes on to say, a cost increase cannot be said to have occurred when the contractor maintains a staffing level over the course of performance that never goes beyond the number contemplated at the outset.

The Government's position is summed up in a letter of April 29, 1987 from the Acting Director of the Bureau of Program Operations (a component of HCFA) to the Administrator of the Federal Programs Division of the Blue Cross and Blue Shield Association: "We will pay only the actual additional costs resulting from the new work when additional resources are utilized to implement the changes; we will not reimburse work which is carried out with existing resources already included in the contract price."

On first hearing, the Government's argument has appeal. However, as a matter of contract law, the argument is not sound—at least not in the present factual context. The subcontract was not a "level-of-effort" undertaking.[5] Nor, for that matter, did the subcontract contain any provisions obligating Empire to dedicate a fixed number of personnel to the various tasks it had agreed to perform. Rather, the subcontract involved a commitment on Empire's part to undertake, for a fixed price, all work of a certain character, and of an estimated quantity.

■ Thus, had the accomplishment of that work required a larger staff than the number on which Empire's bid was based, no additional compensation would have been forthcoming from the Government because the risk of a cost miscalculation of that sort was inherent in the fixed price nature of the undertaking.[6] Empire would have had to absorb the loss. *Mills Mfg. Corp. v. United States*, 215 Ct.Cl. 536, 566, 571 F.2d 1162, 1177 (1978). By the same token, however, the accomplishment of the work with fewer personnel than initially thought necessary becomes a circumstance that inures exclusively to Empire's benefit. Savings in estimated costs realized by a contractor during performance of the base contract work give the Government no reprieve from the obligation to pay more for extra work.

■ As to the contention that the Changes clause obligates the Government to pay for added work only when added costs are involved, the short answer is that there were added costs involved here. Any deployment of a contractor's free resources involves the relinquishment of an alternative utilization of those resources and thus involves a cost in an economic sense.[7] Anthony & Reece, *Accounting Principles* 491 (5th ed. 1983).

---

5. The Federal Acquisition Regulations describe a firm fixed price, level-of-effort term contract as one that requires "(a) the contractor to provide a specified level of effort, over a stated period of time, on work that can be stated only in general terms and (b) the Government to pay the contractor a fixed dollar amount." 48 C.F.R. § 16.207–1 (1990).

6. The contract did contain a clause which provided for the renegotiation of the entire fixed price of $48,903,000 in the event of certain contingencies including "significant changes in

scope of work." However, there is no contention made here that this price renegotiation clause was meant to supersede the operation of the contract's standard "changes" clause or that the changes in question constituted "significant changes" within the meaning of that clause.

7. The same thought is put this way in Cibinic & Nash, *Administration of Government Contracts* 467 (2d ed. 1985): "A contractor's cost may be increased by a change even though he makes no additional expenditure or incurs no additional obligation. Costs are considered to be incurred

In addition to the points discussed above, the Government also seems to be arguing here that the changes for which Empire is demanding compensation did not, in fact, involve any additional work. Rather, those changes involved a substitution of new work for old. In other words, different work from that initially anticipated.

This is not an argument to which the court can give serious attention. Empire's affidavits on this issue (the affidavits of its manager of Financial and Administrative Services) state unequivocally that of the 23 contract amendments involved in this subcontract effort, 14 involved price adjustments and, of these, "eleven changes involved only additional work." The affidavits further point out that the labor costs associated with the additional work were calculated on the basis of time records kept by people working on the various projects involved and in accordance with the requirements of the contract.

The Government offers no refutation of these assertions beyond pointing out that the work now claimed as an extra occasioned no increase in planned staffing levels. For the reasons already stated, this is not a factor that can make a difference: the bargain we are concerned with here involved a fixed price undertaking for the purchase of the contractor's results; not the contractor's resources.[8]

### III

For the reasons stated, plaintiff's cross-motion for summary judgment is granted and defendant's motion for summary judgment is denied. The counterclaim shall be dismissed. The Clerk is to enter judgment accordingly.

---

when the contractor is deprived of something of value." In the present situation, of course, the "something of value" of which the contractor is deprived is the labor of his employees, which would otherwise be at his disposal for whatever use he might choose.

**8.** Although the Government, at oral argument, referred to the difference between the estimated staffing level set forth in Empire's Certificate of Current Cost or Pricing Data and its actual staffing level as a "huge, glaring discrepancy," no formal challenge to that certification has been presented here. Accordingly, this opinion may not be read as offering any views on the reasonableness or sufficiency of Empire's certification.